# 14-1786 (L)

**14-1830 (Con), 14-2130 (Con), 14-2248 (Con)**

## United States Court of Appeals

*for the*

## Second Circuit

CENTRAL HUDSON GAS & ELECTRIC CORP.,
PEOPLE OF THE STATE OF NEW YORK, PUBLIC SERVICE COMMISSION
OF THE STATE OF NEW YORK, NEW YORK POWER AUTHORITY,
NEW YORK STATE ELECTRIC AND GAS CORPORATION,
ROCHESTER GAS AND ELECTRIC CORPORATION,

*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent,*

ENTERGY NUCLEAR POWER MARKETING, LLC, NRG POWER
MARKETING LLC, GENON ENERGY MANAGEMENT, LLC, ARTHUR
KILL POWER LLC, ASTORIA GAS TURBINE POWER LLC, DUNKIRK
POWER LLC, NRG BOWLINE LLC, HUNTLEY POWER LLC, OSWEGO
HARBOR POWER LLC, INDEPENDENT POWER PRODUCERS OF NEW
YORK, INC. (IPPNY),

*Intervenors.*

On Petition for Review of Orders of the Federal Energy Regulatory Commission

REPLY BRIEF OF PETITIONERS CENTRAL HUDSON GAS & ELECTRIC
CORPORATION, NEW YORK POWER AUTHORITY, NEW YORK STATE
ELECTRIC & GAS CORPORATION, AND ROCHESTER GAS AND
ELECTRIC CORPORATION

Raymond B. Wuslich
Winston & Strawn LLP
1700 K Street, NW
Washington, DC  20006-3817
(202) 282-5000

Paul Colbert
Central Hudson Gas & Electric Corp.
Associate General Counsel-Regulatory
Affairs
284 South Avenue

Email: RWuslich@winston.com

*Attorney for Central Hudson Gas & Electric Corp., New York Power Authority, New York State Electric & Gas Corp., Rochester Gas and Electric Corp.*

Glenn D. Haake
Principal Attorney
New York Power Authority
30 South Pearl Street – 10th Floor
Albany, NY 12207-3245
(518) 433-6720
Email: Glenn.Haake@nypa.gov

*Attorney for New York Power Authority*

Poughkeepsie, NY 12601
(845) 486-5831
Email: pcolbert@cenhud.com

*Attorney for Central Hudson Gas & Electric Corporation*

R. Scott Mahoney
New York State Electric & Gas Corporation
Rochester Gas and Electric Corporation
Iberdrola USA
18 Link Drive
P.O. Box 5224
Binghamton, NY 13902-5224
(207) 688-6363
Email: Scott.Mahoney@iberdrolausa.com

*Counsel for New York State Electric & Gas Corporation and Rochester Gas and Electric Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

GLOSSARY ..................................................................................... iv

I.    INTRODUCTION ..................................................................1

II.   ARGUMENT..........................................................................7

     1.    The Court Owes FERC No Deference When it Failed to Apply its Own Standard to Consider the Evidence and Arguments Showing that NYISO Overstated the Need for Capacity in the New Zone. ......................................................................................7

     2.    The Court Owes FERC No Deference When it Failed to Explain Why  Keeping the Lower Hudson Valley Capacity Zone in Place Will Send "Appropriate Price Signals" When the Transmission Constraint that Justified the Zone Is Eliminated. .........17

     3.    FERC's Various Explanations for Rejecting NYISO's Phase-in Proposal Misstate the Tariff and Are Insufficient As a Matter of Law. ................................................................................................24

III.  CONCLUSION..........................................................................28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Black Oak Energy, LLC v. FERC*
    725 F.3d (D.C. Cir. 2013)...............................................................16, 21

*City of Charlottesville v. FERC*
    661 F.2d 945 (D.C. Cir. 1981)................................................7, 15, 17

*Elec. Consumers Res. Council v. FERC*
    407 F.3d 1232 (D.C. Cir. 2005)....................................................7, 16

*Elec. Power Supply Ass'n v. FERC*
    No. 11-1486, 2014 WL 2142113 (D.C. Cir. May 23, 2014) ..............15

*Kansas Cities v. FERC*
    723 F.2d 82 (D.C. Cir. 1983).................................................................19

*Louisiana Pub. Serv. Comm'n v. FERC*
    482 F.3d 510 (D.C. Cir. 2007)..............................................................19

*Maine Pub. Utils. Comm'n v. FERC*
    520 F.3d 464 (D.C. Cir. 2008)....................................................15, 16

*NorAm Gas Transmission Co. v. FERC*
    148 F.3d 1158 (D.C. Cir. 1998)........................................................18

*NSTAR Elec. & Gas Corp. v. FERC*
    481 F.3d 794 (D.C. Cir. 2007).........................................................28

*Sam Rayburn Dam Elec. Coop. v. FPC*
    515 F.2d 998 (D.C. Cir. 1975).........................................................19

*Simon v. KeySpan Corp.*
    694 F.3d 196 (2d Cir. 2012) ...............................................................3

*TC Ravenswood, LLC v. FERC*
    741 F.3d 112 (D.C. Cir. 2013)...........................................................3

## ADMINISTRATIVE CASES

*Allegany Generating Station LLC*
147 FERC ¶ 61,147 (2014) ...................................................................23

*Bridgeport Energy, LLC*
114 FERC ¶ 61,265 (2006) ...................................................................28

*New York Independent System Operator, Inc.*
103 FERC ¶ 61,201 (2003) ...................................................................25

*New York Independent System Operator, Inc.*
136 FERC ¶ 61,165 (2011) ...........................................................5, 14, 23

*New York Independent System Operator, Inc.*
140 FERC ¶ 61,160 (2012) ..............................................................17, 9

## STATUTES

16 U.S.C. §§824d(a) and (e) ........................................................4, 15, 16

16 U.S.C. §824d(e) ..............................................................................10

## OTHER AUTHORITIES

"Affidavit of Eugene T. Meehan," at P11 ..............................................12

"Affidavit of Henry Chao and John M. Adams," at P33 .........................14

"Affidavit of John J. Borchert," at P12.................................................14

"Affidavit of Michael D. Cadwalader," at 10.........................................20

"Affidavit of Rana Mukerji," at P11...............................................6, 26

"Affidavit of Tariq N. Niazi," at P2................................................12, 13

FERC Docket No. ER13-1380...............................................9, 14, 17, 20

FERC Docket No. ER14-500................................................6, 12, 26

"Proposed NYISO Installed Capacity Demand Curves for Capability Years
2014/2015, 2015/2016 and 2016/2017," at 37 ...................................12

# <u>GLOSSARY</u>

| | |
|---|---|
| APA | Administrative Procedure Act |
| Central Hudson | Central Hudson Gas & Electric Corporation |
| Demand Curve Order | *New York Independent System Operator, Inc.*, 146 FERC ¶ 61,043 (Jan. 28, 2014) (JA2780) |
| Demand Curve Rehearing Order | *New York Independent System Operator, Inc.*, 147 FERC ¶ 61,148 (May 27, 2014) (JA3014) |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| JA | Joint Appendix |
| Joint Intervenors | Entergy Nuclear Power Marketing, LLC and Independent Power Producers of New York, Inc. |
| New Zone Order | *New York Independent System Operator, Inc.*, 144 FERC ¶ 61,126 (Aug. 13, 2013) (JA969) |
| New Zone Rehearing Order | *New York Independent System Operator, Inc.*, 147 FERC ¶ 61,152 (May 27, 2014) (JA2988) |
| NRG | NRG Power Marketing LLC, GenOn Energy Management, LLC, Arthur Kill Power LLC, Astoria Gas Turbine Power LLC, Dunkirk Power LLC, NRG Bowline LLC, Huntley Power LLC, and Oswego Harbor Power LLC |
| NYISO | New York Independent System Operator, Inc. |
| NYPA | New York Power Authority |
| NYSEG | New York State Electric & Gas Corporation |
| RG&E | Rochester Gas and Electric Corporation |

iv

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | |
|---|---|
| CENTRAL HUDSON GAS & ELECTRIC CORP., PEOPLE OF THE STATE OF NEW YORK, PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, NEW YORK POWER AUTHORITY, NEW YORK STATE ELECTRIC & GAS CORPORATION, ROCHESTER GAS AND ELECTRIC CORPORATION, <br><div align="right">Petitioners,</div><br>v.<br><br>FEDERAL ENERGY REGULATORY COMMISSION, <br><div align="right">Respondent,</div><br><br>ENTERGY NUCLEAR POWER MARKETING, LLC, NRG POWER MARKETING LLC, GENON ENERGY MANAGEMENT, LLC, ARTHUR KILL POWER LLC, ASTORIA GAS TURBINE POWER LLC, DUNKIRK POWER LLC, NRG BOWLINE LLC, HUNTLEY POWER LLC, OSWEGO HARBOR POWER LLC, INDEPENDENT POWER PRODUCERS OF NEW YORK, INC. (IPPNY), <br><div align="right">Intervenors.</div> | Nos. 14-1786 (L), 14-1830 (Con), 14-2130 (Con), 14-2248 (Con) |

# REPLY BRIEF OF PETITIONERS CENTRAL HUDSON GAS & ELECTRIC CORPORATION, NEW YORK POWER AUTHORITY, NEW YORK STATE ELECTRIC & GAS CORPORATION, AND ROCHESTER GAS AND ELECTRIC CORPORATION

## I.    INTRODUCTION

FERC argues that this Court should defer to its decisions below because the issues raised by Petitioners involved judgments about the need to establish a new electric capacity zone in the lower Hudson Valley to prevent a "potential supply

crisis." FERC Br. 15. Laden through FERC's brief is the notion that a new capacity zone is necessary for reliability reasons. *Id*. 1 (FERC approved a new pricing zone "to address dwindling electric generation and long-term reliability concerns"); *id*. 19 ("the Commission weighed the competing goals in this case – reliability and cost"). Indeed, FERC mentions reliability no fewer than 20 times in its brief. *Id*. 1, 11, 19, 20, 21, 24, 26, 28, 29, 35, 36, 40-43, 49.

But reliability is not really an issue in this case. FERC, by its own admission, refused to allow reliability to be a standard for determining whether a new zone was needed. *Id*. 9 ("the Commission rejected . . . the use of reliability criteria to determine whether to create a new zone"). Moreover, Petitioners have *not* contested whether NYISO should have established the lower Hudson Valley capacity zone. The issue is not the need for the new zone—or the reasons for it—but rather how the new zone was structured. In particular, the questions presented here are: whether FERC made a reasoned determination that the calculation of capacity needs in the lower Hudson Valley capacity zone—reflected in demand curves—complies with FERC's own standard to send "accurate price signals" to attract the right amount of capacity; whether FERC acted consistently with its own precedent in refusing to add a sunset provision for the new zone; and whether FERC reasonably explained its decision to reject NYISO's phase-in of the new

2

capacity zone.  By FERC's own admission, it did not do any of these things, thereby warranting reversal.

FERC's initial failure was its refusal to analyze NYISO's calculation of capacity needs, as reflected in a demand curve.  FERC does not deny that the demand curve directly influences the prices resulting from capacity auctions.  Yet, FERC did not scrutinize whether the demand curve will set reasonable prices, on the premise that capacity prices are "determined by supply and demand conditions."  FERC Br. 23.  That is only half right.

The truth is that the capacity "market" price is set at the intersection of two curves:  the "demand curve" calculated by NYISO and approved by FERC and the "supply curve" that results when NYISO ranks offer prices for capacity from lowest to highest until they intersect with the demand curve.[1]  FERC admits that the "demand curve" is not set by the market, but rather is "*administratively determined.*"  *Id*. 6 (citing *KeySpan-Ravenswood, LLC v. FERC*, 348 F.3d 1053, 1054 (D.C. Cir. 2003)).  Indeed, Joint Intervenors state that the administrative role is "[a] critical feature of NYISO's capacity market."  Joint Intervenors Br. 7.  But, despite its "critical" price-setting responsibility, FERC made no effort to assess whether NYISO's plan for the lower Hudson Valley zone will produce capacity

---

[1] *TC Ravenswood, LLC v. FERC*, 741 F.3d 112, 114 (D.C. Cir. 2013) (explaining how capacity prices are set at the intersection of the pre-determined demand curve with the curve that is formed by ranking supplier bids to sell capacity from lowest to highest); *Simon v. KeySpan Corp.*, 694 F.3d 196, 199 (2d Cir. 2012) (same).

prices that are "just and reasonable" (*see* 16 U.S.C. §§824d(a) and (e))—meaning that the right customers are charged appropriate prices for the service. This was reversible error.

Putting aside FERC's reversible error because it failed to follow its own standards in approving the new capacity zone, FERC also has failed to justify its refusal to establish rules for NYISO to eliminate the new capacity zone when it no longer sends "accurate price signals." FERC's logic in approving the capacity zone was that transmission bottlenecks within the former "Rest of State" capacity zone (which included the lower Hudson Valley) required it to be subdivided by separating the lower Hudson Valley into its own pricing zone. FERC predicted in 2012 that capacity prices between these two zones would automatically equalize when the transmission choke point between them is resolved. FERC now is unwilling, however, to have the new capacity zone dissolve when that choke point is removed. It argues that prices must be kept higher in the new zone even if the choke point is removed because it *may* return at some point. FERC Br. 49.

But, FERC has not explained how it knows whether a bottleneck has been only "temporarily" removed, or why the theoretical recurrence of transmission bottlenecks justifies burdening customers with excess bills amounting to hundreds of millions of dollars. FERC also fails to explain how NYISO will achieve FERC's objective to send "accurate price signals" for electric capacity when

4

consumers in the lower Hudson Valley are forbidden from buying lower cost capacity outside of their zone that can be delivered to them when transmission lines become unconstrained. FERC's failure to reconcile its refusal to provide for zone elimination with the need for "accurate price signals" is reversible error.

FERC instead claims that zone elimination rules are a matter to be taken up later. FERC Br. 50. The argument ignores the fact that FERC declined to require NYISO to incorporate zone elimination in the zone formation rules "because an unneeded zone should not experience price separation from its neighboring zones." *New York Independent System Operator, Inc.*, 136 FERC ¶ 61,165, at P70 ("2011 Compliance Order"). Having abandoned the price convergence rationale, FERC erred by not revisiting the zone elimination question.

Worse, FERC's refusal to specify when the lower Hudson Valley zone can be folded back into the larger "Rest of State" zone is undercut by FERC's insistence that new zones must be based on *actual*, not *theoretical*, conditions. "The purpose of creating zones is to help the capacity auctions appropriately select and price capacity resources from among those that participate in the auctions in light of . . . the actual capacity resources found in the NYISO market and the binding transmission constraints that may actually arise in the auction." 2011 Compliance Order at P58 (emphasis added). Thus, FERC erred in relying upon the

theoretical possibility that a choke point may return in refusing to protect consumers against excessive capacity charges.

Finally, in contrast to FERC's refusal to examine *record* evidence showing that NYISO's lower Hudson Valley zone will not send "accurate price signals," it reached for evidence *beyond the record* to reject NYISO's proposed two-year phase-in of higher capacity prices. NYISO's undisputed testimony showed that its proposed phase-in would not have discouraged needed generating capacity. FERC Docket No. ER14-500, "Affidavit of Rana Mukerji," at P11 (JA1625) ("In my judgment, and based on my experience with the development and implementation of ICAP Demand Curves, [the phase-in] would be adequate to retain sufficient existing capacity to meet reliability needs, and send a price signal to attract efficient investment in new and existing Capacity Resources").

With no evidence to counter NYISO, FERC pointed to two proposals to repower generators to claim the new zone was sending "accurate price signals." *E.g.*, New Zone Rehearing Order at P62 (JA3038-JA3039) ("we note that Helios Power Capital, Inc. is seeking permission to restore the Danskammer generating plant due to the creation of the new capacity zone"). However, FERC cited no evidence that Helios would have kept Danskammer mothballed if auction prices for capacity rose 80% instead of 100% or more. Indeed, Central Hudson's recent contract to purchase capacity from Danskammer is priced *far less* than prices set in

6

the new capacity zone (even with the pricing discount), *see* Addendum, which shows both that FERC's guess about the motivation of Danskammer's owners was wrong, and that auction prices are not sending "accurate price signals."

For all of these reasons, the Court should reverse FERC.

## II.   <u>ARGUMENT</u>

### 1.   **The Court Owes FERC No Deference When it Failed to Apply its Own Standard to Consider the Evidence and Arguments Showing that NYISO Overstated the Need for Capacity in the New Zone.**

FERC asks the Court for deference on ratemaking and policy judgments, but the Court owes FERC none because it failed to examine record evidence, answer arguments, or otherwise apply its own standard to ensure that NYISO's lower Hudson Valley zone will send "accurate price signals."  The courts have shown FERC deference in matters involving the setting of capacity prices and predictive economic judgments when it "responds adequately" to the arguments before it and "there is substantial evidence in the record to support the Commission's conclusions."  *Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232, 1239-40 (D.C. Cir. 2005); *City of Charlottesville v. FERC*, 661 F.2d 945, 950 (D.C. Cir. 1981) ("this Court has required the Commission to specify the evidence on which it relied and to explain how that evidence supports the conclusion it reached"). FERC's decisions below fail this legal test.

FERC asserts that the Court owes it deference because FERC alleges that its decisions considered "projected prices under demand curves" submitted by NYISO and the resulting price increases merely reflect that "the impact will be determined by supply and demand conditions." FERC Br. 22-23. But, FERC then admits that it did *not* examine the evidence supporting NYISO's proposed demand curves, *id*. 33, and thus could not know whether NYISO's method for setting prices was reasonable.

FERC faults Petitioners for not alleging that NYISO's proposal to establish the lower Hudson Valley capacity zone is inconsistent with the filed tariff, and accuses Petitioners of seeking to keep capacity prices "artificially low." FERC Br. 15. FERC misstates Petitioners' arguments and mischaracterizes both NYISO's tariff and the record. Since FERC's attack begins with the NYISO tariff, we will start there also.

NYISO's tariff requires it to perform periodic studies to determine whether system conditions require it to establish a new pricing zone for the sale of electric capacity. Section 5.16.2 requires NYISO to "identify the boundary of a New Capacity Zone if there is a constrained Highway interface into one or more Load Zones" as determined by its study. NYISO Tariff § 5.16.2 (JA216). Section 5.16.3 also requires NYISO's study to determine the amount of capacity required by the proposed new capacity zone (called the "Indicative NCZ Locational

Minimum Installed Capacity Requirement" in the tariff). NYISO is required to "provide an opportunity to stakeholders to review and comment on" its proposed capacity requirement for the new zone. *Id*.; *see New York Independent System Operator, Inc.*, 140 FERC ¶ 61,160, at P50 (2012) ("2012 Compliance Order"). Section 5.16.4(a) requires NYISO to file a proposal to form a new capacity zone in which it "shall include in the filing a report of the results of the NCZ Study." NYISO Tariff § 5.16.4(a) (JA217). Thus, the tariff places NYISO's assessment of the need for capacity in the new zone squarely before FERC at the same time that NYISO files a new zone proposal.

The Petitioners have not alleged a tariff violation because NYISO did not commit one; it filed a proposal to establish a new capacity zone based on an identified transmission constraint, along with the study showing the capacity needs for the new zone as its tariff required. FERC Docket No. ER13-1380, "Affidavit of Henry Chao and John M. Adams" (JA547). Rather, the failure lies squarely with FERC, which failed to examine NYISO's evidence to ensure that it properly determined the capacity needs of the new zone, and failed to answer Petitioners' evidence and arguments showing that NYISO did not.

FERC attempts to excuse its refusal to examine the pertinent evidence and arguments before it, claiming "the proposed method is irrelevant to the factors used to determine when a new capacity zone is needed." FERC Br. 33. FERC also

implies that NYISO's method for determining the capacity needs for the lower Hudson Valley was completely prescribed by its tariff, *id*. 32, and simply imported a preexisting method that gave the Petitioners "advance notice of exactly how the [capacity requirement] would be calculated." *Id*. 34. FERC is wrong.

Section 5.16.3 of NYISO's tariff does not prescribe *any* method for determining the capacity needs for a new capacity zone. It says only that NYISO "shall determine" those capacity needs, and for that reason "provide[s] an opportunity for stakeholders to review and comment on" NYISO's proposed method. If NYISO simply calculated the capacity needs for new capacity zones the same way it does for preexisting capacity zones, there would have been no need for NYISO to attach lengthy affidavits explaining what it did. And, while that tariff section adds that the identified capacity needs are to be used "solely for establishing revised [demand curves]" for the new zone, this caveat does not allow FERC to accept NYISO's capacity determination without question. Rather, the "opportunity for stakeholders to review and comment on" NYISO's determination anticipates a controversy. FERC's reason for being is in significant part to referee such controversies—with the burden of proof to support the rate change resting squarely with the filing utility, in this instance NYISO. 16 U.S.C. §824d(e).

FERC reasons that the capacity quantification dispute belonged in the later case when NYISO filed its actual demand curve. FERC Br. 33. But that was not

FERC's position in 2012 when it recited the tariff's guaranteed opportunity for customers to review and comment on NYISO's capacity determination. 2012 Compliance Order at P50. Under FERC's rationale, consumers could never effectively contest NYISO's calculation of the "demand" part of its "demand curve" because Section 5.16.3 contemplates NYISO will simply "plug" its capacity needs determination into the demand curve it calculates under Section 5.14.1.2. Thus, Section 5.16.3's proviso that stakeholders can object to NYISO's method for "determining" the capacity needs in the new zone would be meaningless if FERC's revised interpretation was correct.

Joint Intervenors echo FERC's themes, contending that Petitioners challenged NYISO's calculation of the capacity needs in the lower Hudson Valley in the "wrong case." Joint Intervenors Br. 52. They claim NYISO "filed and supported" its capacity assessment for the new zone in the proceeding that led to the Demand Zone Order and the Demand Zone Rehearing Order. *Id*. at 52-53 (citing FERC Docket No. ER14-5000, NYISO Proposed Tariff Revisions (Nov. 29, 2013), Ex. B at 60, 83 (JA1380, JA1403)).

Unfortunately for the Joint Intervenors, NYISO neither identified its capacity assumptions in the new case, nor filed new testimony to support them. The citations Joint Intervenors provide for the alleged "support" lie in a study that its sponsor described as addressing four points, none of which covered the

11

"Indicative Locational Capacity Requirement" for the lower Hudson Valley. Rather, the witness testified that the study provided: "(1) an independent statistical and production cost model analysis of Energy and Ancillary Service revenues, (2) an independent assessment of construction costs of peaking technologies, (3) a methodology for determining an appropriate amortization period to reflect an equilibrium level of excess capacity that was integrated with the zero crossing point of the Demand Curves, and (4) assumptions to implement the methodology for determining an appropriate amortization period." FERC Docket No. ER14-500, "Affidavit of Eugene T. Meehan," at P11 (JA1294). The specific pages cited by Joint Intervenors are no more informative.

Nowhere else did NYISO's filing in FERC Docket No. ER14-500 purport to "support" the capacity needs in the lower Hudson Valley as Joint Intervenors allege. The closest the filing came is a depiction of the demand curve that NYISO calculated,[2] and testimony providing "illustrative information regarding the potential wholesale capacity price outcomes that could result from [NYISO's] proposal to 'phase-in' the peaking plant net cost of new entry, upon which the [lower Hudson Valley] Demand Curve is set."[3] Even that "support" used the locational capacity requirement that NYISO calculated in the earlier zone

---

[2] "Proposed NYISO Installed Capacity Demand Curves for Capability Years 2014/2015, 2015/2016 and 2016/2017," at 37 (JA1515).

[3] "Affidavit of Tariq N. Niazi," at P2 (JA1614).

formation proceeding as the basis for the calculation.[4]  Thus, Joint Intervenors have failed to show that Petitioners should have challenged NYISO's determination of the capacity needs in the lower Hudson Valley in the demand curve proceeding rather than in the zone formation proceeding as NYISO's tariff contemplates.

Joint Intervenors also present several arguments they did not raise previously with FERC about the merits of the evidence that Petitioners presented. Joint Intervenors Br. 49-53.  They also skip over the fact that in 2012 the Joint Intervenors raised the same concerns as Petitioners about NYISO's method for determining the capacity needs of the new capacity zones, which prompted FERC to reference the tariff and provide the assurances noted above.  2012 Compliance Order at PP41-42, 50.  Regardless of Joint Intervenors' change of heart in view of the dollars now at stake for them, their new merits argument amplifies FERC's error in ruling that it "does not need to determine whether NYISO's method for deriving the [capacity needs for the lower Hudson Valley] is appropriate."  New Zone Rehearing Order at P27 (JA3001).

Finally, and most importantly, FERC never explains how it could know whether NYISO's proposal to create the new capacity zone would send "accurate price signals."  As Petitioners previously explained—and FERC does not dispute— sending accurate price signals means that prices should provide incentives "to

---

[4] *Id*. at P11 (JA1616).

13

attract and retain capacity needed to meet reliability objectives in the constrained area" while "avoiding the encouragement of capacity that is not needed in that area."[5]

FERC cannot know whether it has met its own test. FERC refused to examine evidence about the need for capacity in the lower Hudson Valley as presented by either NYISO[6] or Petitioners.[7] As FERC admits, FERC Br. 6, NYISO's "demand curves" are established through an administrative process that occurs <u>before</u> NYISO conducts its supply auctions. But, if the capacity needs used to establish the demand curve are wrong, then the curve will be misshaped and the supply curve will intersect the demand curve at the wrong point. In terms of this case, if NYISO has overstated the capacity needs in the lower Hudson Valley as the Petitioners demonstrated to FERC, NYISO will accept too much capacity in its auctions. Since it ranks bids from lowest to highest, NYISO will accept higher priced offers than it would if it used a lesser (correct) amount of capacity to set the demand curve. In other words, price signals will not be accurate.

FERC's claim that it "considered" consumer impacts because it was generally aware that capacity prices would rise in the lower Hudson Valley misses

---

[5] *New York Independent System Operator, Inc*., 136 FERC ¶ 61,165, at P57 (2011).

[6] FERC Docket No. ER13-1380, "Affidavit of Henry Chao and John M. Adams," at P33 (JA560).

[7] FERC Docket No. ER13-1380, "Affidavit of John J. Borchert," at P12 (JA662).

the point.  FERC Br. 21.  Worse, FERC's logic has no limiting principle—under its theory FERC could easily justify doubling, tripling, or quadrupling capacity prices to provide an "incentive" for new generation investment, but FERC has failed to explain where it draws the line between reasonable and unreasonable rate increases as the Federal Power Act requires.  16 U.S.C. §§824d(a) and (e); *cf. Elec. Power Supply Ass'n v. FERC*, No. 11-1486, 2014 WL 2142113, at *6 (D.C. Cir. May 23, 2014) (criticizing FERC's rationale because it lacked any limiting principle to establish reasonable boundaries under Section 205).  Petitioners have never claimed FERC was required to "provide its own precise quantification of consumer impacts," FERC Br. 22, as FERC claims.  That does not mean FERC is free to "pluck rates out of thin air," *Maine Pub. Utils. Comm'n v. FERC*, 520 F.3d 464, 472 (D.C. Cir. 2008), especially when FERC's definition of "accurate price signals" means "avoiding the encouragement of capacity that is not needed in that area."  2011 Compliance Order at P57.

To decide whether NYISO's plan met the "accurate price signals" test, FERC was required to perform "an examination of the method employed" by NYISO to ensure that the end result is just and reasonable, and FERC was also required to "specify the evidence on which it relied and . . . explain how that evidence supports the conclusion it reached."  *City of Charlottesville*, 661 F.2d at 950.  It was required to provide "an articulation, in response to serious objections,

of the Commission's reasons for believing that more good than harm will come from its action," *Elec. Consumers Res. Council*, 407 F.3d at 1238 (quoting *Md. People's Counsel v. FERC*, 761 F.2d 768, 779 (D.C. Cir. 1985)), and "rely on record evidence to establish a reasonable range of rates." *Maine Pub. Utils. Comm'n*, 520 F.3d at 472. FERC failed to do any of these things because it ruled that "the Commission does not need to determine whether NYISO's method for deriving the [capacity needs for the lower Hudson Valley] is appropriate." New Zone Rehearing Order at P27 (JA3001). This was reversible legal error.

Having refused to examine key evidence about the capacity needs of the new zone, FERC also failed to uphold its statutory duty to determine whether NYISO's rate proposal satisfied the "just and reasonable" standard in Section 205 of the Federal Power Act . 16 U.S.C. §§824d(a) and (e). That standard requires "all rates and charges made, demanded, or received by any public utility for or in connection with the . . . sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable." *Id*. §824d(a). The just and reasonable standard means that utility customers must be charged rates "which match, as closely as practicable, the costs to serve [them.]"[8] FERC disregarded Petitioners' evidence below that showed NYISO's method incorrectly attributed the capacity needs of consumers in

_____

[8] *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 237 (D.C. Cir. 2013) (quoting *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300-01 (D.C. Cir. 1992)).

the New York City and Long Island capacity zones to the lower Hudson Valley zone. FERC Docket No. ER13-1380, "Affidavit of John J. Borchert," at P12 (JA662). FERC's refusal to examine that evidence means there was no basis for FERC to accept NYISO's proposal as just and reasonable. *City of Charlottesville*, 661 F.2d at 950 (explaining that the court's review of FERC's decisions under the FPA is "akin to the 'substantial evidence' inquiry mandated by the Administrative Procedure Act"). Accordingly, the Court should reverse.

2. **The Court Owes FERC No Deference When it Failed to Explain Why Keeping the Lower Hudson Valley Capacity Zone in Place Will Send "Appropriate Price Signals" When the Transmission Constraint that Justified the Zone Is Eliminated.**

FERC does not explain why (1) NYISO's original zone formation tariff was acceptable on the theory that "if the constraint [between two zones] has been resolved, price convergence between two capacity zones will occur with or without the union of the two separate capacity zones,"[9] but (2) when presented with NYISO's plan to form the new zone the opposite was suddenly true: "price separation may well continue after the constraint leading to a new capacity zone disappears" *and* "such potential distinction between prices is appropriate."[10] Both theories cannot be correct. As Joint Intervenors put it, reversal by the Court is justified when "the Commission had 'inexplicably distorted' the theory that it

---

[9] *New York Independent System Operator, Inc.*, 140 FERC ¶ 61,160, at P51 (2012).

[10] New Zone Order at P 83 (JA999).

claimed to apply."  Joint Intervenors Br. 32 (quoting *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1008 (D.C. Cir. 1987)).  FERC's irreconcilable economic theories in decisions issued a few months apart—and involving the same utility, parties, market and product—present exactly such an  impermissible distortion.

FERC does not deny, or explain, the about-face—which is reversible error by itself—or directly respond to Petitioners' arguments, which is also reversible error.  *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998) ("it most emphatically remains the duty of this court to ensure that an agency engage the arguments raised before it").

Instead, FERC claims deference by suggesting it has flexibility to decide how to manage its cases.  FERC Br. 50.  Joint Intervenors also ignore FERC's inconsistent use of economic theory when they claim that "FERC did not distort the theory that locational prices are necessary *when binding transmission constraints exist* . . . ," Joint Intervenors Br. 32 (emphasis added), thereby highlighting the very problem they seek to deflect.  Undeterred, Joint Intervenors suggest the Court should not be troubled by FERC's piecemeal decision-making. *Id*. 46-47.

FERC cannot so easily be let off the hook.  FERC cannot seemingly hold out a legal interpretation favorable to Petitioners as it did in 2012 only to reverse course in a later ruling and escape judicial review on the theory that it has the right

to control its procedures.[11]   As the court ruled in analogous circumstances in *Louisiana Public Service Commission*, if review of the Commission's decision was unavailable, "then an 'agency [could] enter an ambiguous or obscure order, willfully or otherwise, wait out the required time, then enter an 'explanatory' order that would extinguish the review rights of parties prejudicially affected."[12]   The court added that "the law of this circuit does not allow such a 'perversion' of the 'policy requiring timely filing of motions for reconsideration.'"[13]

In other words, if FERC had used its current economic theory to justify its acceptance of NYISO's new zone tariff in 2012, Petitioners could have sought rehearing and appealed FERC's decision before NYISO formed the lower Hudson Valley zone.  Now, FERC and Joint Intervenors ask this Court to inflict an even more egregious "perversion" of Petitioners' review rights by requiring them to abide by the terms of the tariff that FERC accepted in 2012, which is now beyond challenge, *and* to accept FERC's new and inconsistent zone pricing theory to lock-in the lower Hudson Valley zone until NYISO decides (some day) to amend the tariff to solve FERC's interpretation problem.

---

[11] *Louisiana Pub. Serv. Comm'n v. FERC*, 482 F.3d 510, 517 (D.C. Cir. 2007); *Kansas Cities v. FERC*, 723 F.2d 82, 85-86 (D.C. Cir. 1983); *Sam Rayburn Dam Elec. Coop. v. FPC*, 515 F.2d 998, 1007 (D.C. Cir. 1975).

[12] *Louisiana Pub. Serv. Comm'n*, 482 F.3d at 517.

[13] *Id*.

In attempting to ride to FERC's rescue, Joint Intervenors have illustrated why FERC's silence on the underlying issue is unreasonable.  Joint Intervenors defend FERC's logic that separate zones should remain in place, even after a bottleneck between zones is cured, "because the cost of new entry may remain higher in that area than the remainder of the State."  Joint Intervenors Br. 48.

This argument misses the point:  as FERC reminds the Court, FERC Br. 19, the tariff requires the formation of new zones *because of transmission constraints*, not because of differences in *construction costs*.  And, capacity prices are influenced by other changing variables, like decreases in demand within a zone, the addition of new generating facilities, or even the retirement of generating facilities outside of the constrained zone.  FERC Docket No. ER13-1380, "Affidavit of Michael D. Cadwalader," at 10 (JA702).  Unlike construction costs, these variables can all affect the constraint between two zones by affecting the ability to move power over the transmission network.  *Id.*  Despite factors such as these that affect transmission bottlenecks, Joint Intervenors ask the Court to agree that, once established, zones should remain separate indefinitely regardless of actual conditions on the transmission network, and thereby preserve the high capacity prices flowing to them.  The Court has no obligation to lock in this windfall.

FERC's brief also reveals a troubling unfamiliarity with the relationship between transmission bottlenecks and pricing that shows why its analysis of the record before it was incomplete. In responding to a point raised by the New York Public Service Commission, FERC argues that "[i]t was reasonable for the Commission to conclude that the creation of the New Capacity Zone, and the corresponding price differential it would create, should increase the value of the transmission because it would allow capacity sellers in an unconstrained zone to sell in a higher-priced constrained zone, thereby increasing the value of the transmission." FERC Br. 36. This statement is incorrect.

FERC has confused the effect that relieving a bottleneck has on prices in the *energy* market with the effect it would have on *capacity* pricing under the existing, flawed tariff provisions. In the energy market, removing a bottleneck causes the prices on either side of the constraint to equalize. Under NYISO's flawed capacity pricing rules, this cannot happen because a generator located outside of the formerly constrained area (*e.g.*, the lower Hudson Valley) is not permitted to sell its capacity inside the formerly constrained area—even though eliminating the constraint means that its capacity can be delivered into the zone. Instead, the shut-out generator must offer to sell its capacity in the zone where it is located at a lower price.

21

FERC's position also reveals unfamiliarity with how its price mitigation rules for capacity zones establish the kind of "artificial" prices that it claims to disdain. FERC has not disputed Petitioners' demonstration that keeping zone boundaries in place after a choke point has been removed means that price mitigation will continue to be used to send inefficient price signals that will unnecessarily increase costs to consumers. Recall FERC's claim that this sort of "artificial" pricing forced it to spring into action to save consumers from the evils of paying too little for capacity. FERC Br. 24-25. Without explanation, however, FERC is dragging its feet when "artificial" prices cause consumers to pay too much. Apparently, the market can never have too many generators. Perhaps, but FERC owes consumers (and the Court) a reasonable explanation for why this approach "avoid[s] the encouragement of capacity that is not needed in that area." 2011 Compliance Order at P57.

The consequence of these pricing rules—keeping unneeded zone boundaries in place and using "price mitigation" as a substitute for the market even when there is no market power to mitigate—is that generators located outside of the zone are paid less than they otherwise would be, while consumers inside the formerly constrained zone continue to pay more than they should for capacity. Of course, preserving this arrangement regardless of actual system conditions works out very well for generators that are able to sell capacity within the price-protected zone—

like the Joint Intervenors.[14]  Hence, the pricing rules that FERC has approved prevent the pricing equilibrium process that it describes on page 36 of its brief. Given that FERC's decision below rested in part on a misunderstanding of cause and effect in the capacity pricing rules that FERC approved, the Court should reverse.

Finally, it is important to recall that when FERC rejected NYISO's first attempt to establish tariff guidelines for new zone formation, FERC did so in part because NYISO had failed to use actual system conditions as the controlling principle.  As FERC explained:  "The purpose of creating zones is to help the capacity auctions appropriately select and price capacity resources from among those that participate in the auctions in light of all the actual constraints that exist. This purpose can be accomplished only by considering the ability of the transmission grid to accommodate the actual capacity resources found in the NYISO market and the binding transmission constraints that may actually arise in the auction."  *New York Independent System Operator, Inc.*, 136 FERC ¶ 61,165, at P58 (2011) (emphasis added).

---

[14] When NYISO recently asked FERC to waive a technical tariff requirement to permit a repowering generator to offer its capacity in the auctions, the Joint Intervenors and NRG objected, claiming "the waiver will . . . artificially increase the amount of [capacity] that will be offered in to the market, reducing the ICAP revenues for other suppliers that wish to participate in the ICAP market."  *Allegany Generating Station LLC*, 147 FERC ¶ 61,147, at P11 (2014).  Apparently, there can be too many generators when zone boundaries provide the incumbent sellers price protection.

Now that FERC has achieved its goal to establish a new capacity zone in the lower Hudson Valley, it is suddenly no longer interested in capacity auctions that "appropriately select and price capacity resources . . . in light of all the actual constraints that exist." FERC's refusal to make sure that capacity pricing in the lower Hudson Valley complies with this principle was unreasonable. FERC's refusal to answer Petitioners' objections to its unexplained reversal on this issue is reversible error.

For all of these reasons, the Court should reverse FERC.

## 3. FERC's Various Explanations for Rejecting NYISO's Phase-in Proposal Misstate the Tariff and Are Insufficient As a Matter of Law.

As Petitioners have explained, FERC recognized its legal obligation to "balanc[e] . . . consumer and investor interests,"[15] but then cited the need to send "accurate price signals"[16] to reject NYISO's phase-in proposal without evaluating whether it would actually make any proposed generating project uneconomic. Thus, FERC did not use its own standard to weigh the higher costs to consumers against NYISO's claim that a phase-in would not discourage any generation investment.

FERC attempts to defend its decision by variously alleging that NYISO's phase-in proposal "was inconsistent with its Tariff," FERC Br. 43, that NYISO

---

[15] Demand Curve Rehearing Order at P59 (JA3037).

[16] *Id*. at P61 (JA3037).

actually proposed to "include a phase-in in the tariff itself," *id*. 48, and that NYISO "did not satisfy its burden to show that a phase-in was just and reasonable." *Id*. 45. None of these contentions withstands scrutiny.

FERC identifies no provision in NYISO's tariff that precludes it from phasing in higher capacity prices. There is none, and the orders below did not claim otherwise. Thus, FERC's new claim that NYISO's proposal "was inconsistent with its Tariff" cannot be relied upon by the Court.

NYISO also did not propose to "include a phase-in in the tariff itself," as FERC argues in attempting to distinguish a prior case when FERC allowed NYISO to phase-in higher capacity prices without any objection. *New York Independent System Operator, Inc*., 103 FERC ¶ 61,201, at P44 (2003). Again, the Court cannot rely on FERC's new claim.

FERC's assertion that NYISO "did not satisfy its burden to show that a phase-in was just and reasonable" simply ignores NYISO's evidentiary showing in support of its request without identifying the deficiency. Elsewhere in its brief FERC concedes its determination of the justness and reasonableness of a utility's rate filing depends on "a reasonable balancing, based on factual findings, of the investor interest in maintaining financial integrity and access to [capital] markets and the consumer interest in being charged non-exploitive rates." FERC Br. 25

(quoting *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1177-78 (D.C. Cir. 1987) (en banc)).

FERC does not discuss the evidence before it, or explain how it "balanced" investor and consumer interests. FERC's "balancing" consisted of the claim that discounting capacity auction prices for two years would not send "accurate price signals." Demand Curve Rehearing Order at P62 (JA3038). FERC ignored the fact that the phased-in prices would still have been much higher in the lower Hudson Valley than in previous auctions, and FERC made no finding based on the record before it that a phase-in would have kept needed generation out of the market. Indeed, NYISO filed testimony stating that the discount prices "would be adequate to retain sufficient existing capacity to meet reliability needs, and send a price signal to attract efficient investment in new and existing Capacity Resources." FERC Docket No. ER14-500, "Affidavit of Rana Mukerji," at P11 (JA1625).

Unable to refute NYISO's testimony, FERC instead argued that two proposals to build generating plants confirmed the wisdom of its decision. New Zone Rehearing Order at P62 (JA3038-JA3039). Joint Intervenors make a similar claim. Joint Intervenors Br. 43-44.

However, there was no record support for FERC's claim that the owners of the mothballed Danskammer generating plant decided to return it to service "due to

26

the creation of the new capacity zone." The pricing in Central Hudson's contract to purchase capacity from the plant is in the $5.00-$6.50 per kilowatt per month range (depending on performance), which is far below the $10-to-$12 prices that have prevailed in NYISO's capacity auctions. If anything, the contract confirms that NYISO's FERC-approved method is mispricing capacity, and that a modest discount to prices set using NYISO's miscalculated demand curve would not have kept the Danskammer plant from repowering.

The story for NRG's Bowline Unit 2 generating facility is similar, as FERC cited no evidence that NRG would have backtracked on its decision to restart the plant if capacity prices were modestly discounted. NRG took the time to intervene and submit a brief to the Court, but does not claim otherwise. Thus, the evidence before FERC provides no support for its claim that it needed to reject NYISO's discount proposal to send "accurate price signals."

Finally, FERC claims Petitioners failed to seek rehearing of its "waiver" rationale, which FERC admits it offered for the first time in its Demand Curve Rehearing Order. FERC Br. 47. FERC issued that order on the same day that it answered Central Hudson's petition asking this Court for a Writ of Mandamus, which became necessary because FERC failed to act on Petitioners' requests for rehearing for eight months. FERC now argues, in effect, that Petitioners should have returned to the agency for another round of rehearing requests while again

27

waiting many months for a response from FERC.  In the meantime, Petitioners' customers would pay several hundred million dollars more in capacity charges.

The added procedural step FERC suggests would have been pointless, and unnecessarily costly to consumers.  In any event, the law does not back up FERC's claim.  As FERC itself has acknowledged elsewhere, "[r]ehearing of an order on rehearing lies only when the order on rehearing modifies the result reached in the original order that gives rise to a wholly new objection."[17]  That did not occur here.

For all of these reasons, FERC's decision to deny NYISO's proposal to phase in the higher capacity prices in the lower Hudson Valley did not evaluate NYISO's evidence, did not balance consumer and investor interests, and was legally erroneous.  Accordingly, the Court should reverse.

## III.   CONCLUSION

For the foregoing reasons, the Court should find that FERC's orders authorizing NYISO to establish a new capacity zone in the lower Hudson Valley were arbitrary and capricious, failed to examine relevant evidence, departed from FERC's precedent without a reasoned explanation, and were otherwise contrary to law.  The Court should, therefore, remand FERC's orders to the agency for further

---

[17] *Bridgeport Energy, LLC*, 114 FERC ¶ 61,265, at P9 (2006) (citing *S. Natural Gas Co. v. FERC*, 877 F.2d 1066, 1073 (D.C. Cir. 1989)); *see NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 801-02 (D.C. Cir. 2007) ("when FERC makes no change in the result on rehearing but merely supports the old outcome with new arguments, a party can obtain judicial review without filing a new petition for rehearing").

proceedings to address the issues raised by Petitioners.  The Court should further direct FERC to provide refunds to electric retailers such as Petitioners to the extent FERC's proceedings determine that NYISO's tariff for establishing the lower Hudson Valley capacity zone resulted in excessive charges so that Petitioners may provide full relief to their electricity customers.

Dated:  August 18, 2014                    Respectfully submitted,

*/s/  Raymond B. Wuslich*
Raymond B. Wuslich
Winston & Strawn LLP
1700 K Street, NW
Washington, DC  20006-3817
Email:  RWuslich@winston.com

*Attorney for Petitioners Central*
*Hudson Gas & Electric Corporation,*
*New York Power Authority, New York*
*State Electric & Gas Corporation,*
*and Rochester Gas and Electric*
*Corporation*

*/s/ Paul Colbert*                          */s/ Glenn D. Haake*
Paul Colbert                               Glenn D. Haake
Central Hudson Gas & Electric Corp.        Principal Attorney
Associate General Counsel–                 New York Power Authority
    Regulatory Affairs                 30 South Pearl Street – 10th Floor
284 South Avenue                           Albany, NY  12207-3245
Poughkeepsie, NY 12601                     (518) 433-6720
(845) 486-5831                             Email:  Glenn.Haake@nypa.gov
Email:  pcolbert@cenhud.com

*Attorney for*                              *Attorney for*
*Central Hudson Gas & Electric Corp.*      *New York Power Authority*

29

*/s/ R. Scott Mahoney*
R. Scott Mahoney, Esq.
New York State Electric &
      Gas Corporation
18 Link Drive
P.O. Box 5224
Binghamton, NY  13902-5224
(207) 688-6363
Email:  scott.mahoney@iberdrolausa.com

*Attorney for*
*New York State Electric & Gas Corp.*

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance with Rule 32(a)**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    o  this brief contains 6,577 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    o  this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, 14 pt. Times New Roman font.

/s/ *Raymond B. Wuslich*
Raymond B. Wuslich
Winston & Strawn LLP
1700 K Street, NW
Washington, DC  20006

*Attorney for Central Hudson Gas & Electric Corporation, New York Power Authority, New York State Electric & Gas Corporation, and Rochester Gas and Electric Corporation*

Dated: August 18, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2014, I electronically filed the foregoing Reply Brief with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Raymond B. Wuslich*
Raymond B. Wuslich
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006

*Attorney for Central Hudson Gas &*
*Electric Corporation, New York*
*Power Authority, New York State*
*Electric & Gas Corporation, and*
*Rochester Gas and Electric*
*Corporation*

Dated: August 18, 2014

## **ADDENDUM**

**PAGE**

Central Hudson and Mercuria Energy America, Inc.'s
Term Sheet for Purchase and Sale of NYISO Unforced Capacity…………..…..A-1

CONFIDENTIAL
NOVEMBER 1, 2013

**TERM SHEET FOR PURCHASE AND SALE OF NYISO UNFORCED CAPACITY**

The following terms and conditions are the proposed terms and conditions under which Seller and Buyer (as defined below) would be willing to enter into a term capacity purchase/sale transaction. Documentation of the actual transaction is subject to the "Conditions" set forth below and the agreement of the parties to a mutually acceptable term capacity purchase/sale transaction document.

| | |
|---|---|
| **Seller:** | Mercuria Energy America, Inc. ("MEA") or any permitted assignee of MEA |
| **Buyer:** | Central Hudson Gas and Electric Corp. |
| **Product:** | "NYISO UCAP" means Unforced Capacity, as defined in the New York Independent System Operator ("NYISO") Market Administration and Control Area Services Tariff (as amended from time to time, hereinafter referred to as the "Tariff"). Capitalized terms used in this term sheet which are not defined herein shall have the meaning ascribed to them in the Tariff. The NYISO UCAP shall be allocated to the Specified Units of the Facility (as those terms are defined below). |
| **Term:** | Each month of the four (4) year period beginning on May 1, 2014 and ending on April 30, 2018. Each month during the term shall be referred to as a "Monthly Delivery Period". Prior to the start of the fourth year of the contract there will be a reopener that allows for the reset of the pricing based on the percentage change in the strip auction ICAP clearing price between May 2014 and May 2017 for LHV or if LHV doesn't exist then the percentage change in the forecasted ICAP strip auction between May 2014 and May 2017 for ROS, either plus or minus. The prices for year 4 cannot change more than 15% from year 3. |
| **Facility:** | Danskammer Generation Facility located in Newburgh, NY, consisting of the following specified units (the "Danskammer Units"): |

> Danskammer Generation Facility Unit 1 – PTID 23586
> Danskammer Generation Facility Unit 2 – PTID 23589
> Danskammer Generation Facility Unit 3 – PTID 23590
> Danskammer Generation Facility Unit 4 – PTID 23591

**(Note** – Actual NYISO PTID's for Danksammer Units to be assigned)

| | |
|---|---|
| **Contract Quantity:** | The total amount of Unforced Capacity produced each month by the Danskammer Units, up to a maximum of four hundred and seventy five (475) MW. |
| **Delivery Point:** | The transfer of the Product will take place on the NYISO ICAP Automated Market System via an internal bilateral transaction originated by the Seller or Seller's designated agent and accepted by the Buyer or the Buyer's designated agent for delivery of the Product to the account or the Buyer or the Buyer's designated agent. It is contemplated that the Product will not be exported to any external markets outside NYISO. |

*CONFIDENTIAL*
*NOVEMBER 1, 2013*

**Certification:**  Seller shall be obligated to indicate the Contract Quantity and Delivery Point of NYISO UCAP to be sold to Buyer by submitting the appropriate certification to the NYISO no later than the relevant deadline for the applicable Capability Period. Buyer shall be obligated to indicate the Contract Quantity and Delivery Point of NYISO UCAP to be purchased from Seller by submitting the appropriate certification to the NYISO no later than the relevant deadline for the applicable Capability Period.

**Contract Price/ Calculation Of Payments:**  The contract price to be paid by Buyer to Seller will be:

0 – 200 UCAP MW - $6.50 per Kw-month plus a 2.5% annual adder over the term of the contract.
200.1 – 300 UCAP MW - $6.00 per Kw-month plus 2.5% annual adder over the term of the contract.
300.1 – 400 UCAP MW - $5.50 per Kw-month plus 2.5% annual adder over the term of the contract.
Greater than 400 UCAP MW - $5.00 per Kw-month plus 2.5% annual adder over the term of the contract.

Buyer has the obligation to purchase all UCAP MWs available for sale from the Danskammer Units up to 475 mws and Seller is obligated to sell all UCAP MWs available from the Danskammer Units up to 475 mws.

Payment to Seller will be calculated each month for Capacity as a sum equal to the product of applicable Contract Price *times* the Contract Quantity of Product transferred during the applicable Monthly Delivery Period.

**Scheduling:**  Quantity of Product will be scheduled, confirmed and certified via the NYISO's ICAP Automated Market System for the transfer of Capacity.

**Invoicing and Payment:**  Buyer shall pay an incentive payment of $2,000,000.00 upon Mercuria (or its permitted assignee) entering into a binding contract for the repair and refurbishment of the Facility with the intent of returning the Facility and the applicable Danskammer Units to service, including the capability of providing at least 90 MW of UCAP for all capability periods covered under the term of this agreement (see Refund Calculation).

Additional incentive payments of $2,000,000 will be made for each additional 100 MW of UCAP brought on line above 200 MW prior to May 1, 2015 ($2,000,000 payment if UCAP value is between 200 – 300 MW and additional $2,000,000 payment if UCAP value is between 300 – 400 MW). Additional incentive payments will be subject to refund, as defined in the Refund Calculation, if UCAP MWs are not available in subsequent capability periods.

Refund Calculation –

Page 2 of 6

**A-2**

CONFIDENTIAL
NOVEMBER 1, 2013

(a) If any units in the Facility are retired or mothballed the following refund will take place if the UCAP level falls below a MW level that had triggered an incentive payment. The calculation will be as follows: The incentive payment amount times the number of months remaining in the Term of the contract divided by the total number of months that were in the Term of the contract when the event that triggered the incentive payment took place.

(b) If any units in the Facility are unavailable or derated the following refund will take place if the UCAP level falls below a MW level that had triggered an incentive payment. The calculation will be as follows: The incentive payment amount times 1 divided by the total number of months that were in the Term of the contract when the event that triggered the incentive payment took place to be paid back monthly each month that you are below the level.

Buyer shall pay the full purchase price for the Contract Quantity of Product sold and delivered during a Monthly Delivery Period on or before the later of the twentieth (20th) day of each calendar month following the applicable Monthly Delivery Period, or the tenth (10th) day after receipt of Seller's invoice; provided, however, if either of such dates is not a Business Day, then on the next Business Day.

**Liquidated Damages for Failure to Perform:**

If capacity is available from Danskammer Units and Seller fails to certify the NYISO UCAP for an applicable Capability Period, such failure is not due to Force Majeure and Buyer has fulfilled its obligations for purposes of receiving the Product, then Seller shall pay to Buyer, on the date payment upon which Buyer's payment would otherwise have been due to Seller hereunder, an amount equal to the positive difference, if any, obtained by subtracting the Contract Price from the Capacity Replacement Price and multiplying the resulting difference by the volume of the Product not delivered by Seller. The remedy set forth herein shall be the sole remedy for Seller's unexcused failure to schedule and deliver the Product.

If Buyer fails to certify the NYISO UCAP for an applicable Capability Period, such failure is not due to Force Majeure and Seller has fulfilled its obligations for purposes of delivery of the Product, then Buyer shall pay to Seller, on the date upon which Buyer's payment would otherwise be due to Seller hereunder, an amount equal to the positive difference, if any, obtained by subtracting the Contract Price from the Capacity Sales Price and multiplying the resulting difference by the volume of the Product not received by Buyer. The remedy set forth herein shall be the sole remedy for Buyer's unexcused failure to perform.

If both Parties fail to timely certify the Product on any one occasion, neither Party shall be entitled to any damages or remedies under the Transaction for such occasion. For purpose of this term sheet, the term (a) "Capacity Replacement Price" shall mean the NYISO Spot auction price applicable for the particular Monthly Delivery Period and (b)

CONFIDENTIAL
NOVEMBER 1, 2013

"Capacity Sale Price" shall mean the price received by Seller for the Capacity not scheduled or received by Buyer during any particular Monthly Delivery Period.

If at any time during the Term of the proposed Transaction, any one or all of the Danskammer Units is unable to produce Capacity, Seller will not be obligated to schedule any such Unavailable Capacity and Buyer will not have any obligation to take delivery of any such Unavailable Capacity, the parties recognizing that neither party will have liability to the other party for any damages or cost relating to the Unavailable Capacity.

**Assignability:** This term sheet shall be assignable by MEA to any affiliate of MEA or to any joint venture, limited liability company or similar entity which, as of the date hereof or subsequent to the date hereof, acquires, owns or has the right to acquire or own the Facility and the Danskammer Units (each of the foregoing, together with Helios, being a "Permitted Assignee"), it being understood by Buyer that the Facility and the Danskammer Units are, as of the date hereof, owned by Dynegy Danskammer, LLC, a bankrupt entity ("Dynegy"), but are to be sold, transferred and assigned by Dynegy to Helios Energy Partners, LLC ("Helios") subsequent to the date hereof. Save for the foregoing, this term sheet shall not be assigned by either party without the express written consent of the other party, which consent shall not be unreasonably withheld or denied.

**Termination:** The obligations of the Seller and Buyer may be terminated under the following circumstances:

(a) The determination is made by MEA or its Permitted Assignee in its sole discretion that the damage to the Facility and the Danskammer Units caused by Super Storm Sandy will not enable MEA or its Permitted Assignee to repair and repower the Facility and the Danskammer Units to an operational condition, notice of which will be provided to Buyer on or before May 1, 2015;

(b) In pursuing the repair and repowering of the Facility and the Danskammer Units, MEA or its Permitted Assignee is unable to obtain all permits, licenses or other authorizations from any and all applicable governmental authorities required for the operation of the Facility and the Danskammer Units, including, but not limited to, any authorizations required by the Federal Energy Regulatory Commission ("FERC"), the New York Public Service Commission ("NYPSC"), the New York Department of Environmental Protection and the NYISO; provided, however, it shall not be grounds for termination of the transaction if during the Term, any permits or authorizations temporarily expire or are temporarily terminated or withdrawn, it being contemplated that delays in obtaining or renewing licenses or permits during the Term will only result in Buyer having no obligation to pay for Capacity which is otherwise unavailable from the Danskammer Units (or any one or more *particular* Danskammer Units);

(c) The Danskammer Units, despite being repaired and repowered, are not expected to qualify for Capacity for the remainder of the Term;

CONFIDENTIAL
NOVEMBER 1, 2013

(d) The FERC or the NYPSC issues an order invalidating any or all of the provisions of the agreement between the Parties for Capacity, such that, to the extent only certain provisions are deemed to be invalidated, the invalidated provisions effectively result in the termination of the agreement, provided that any such order is not based upon actions taken by either one of the Parties before either of FERC or the NYPSC, including, to the extent applicable, any violation of any laws, rules, or regulations of either FERC or the NYPSC; and

(e) Any one or all of the Conditions are not satisfied.

**Regulatory Out Clause:** See termination (d)

**Conditions:** The following conditions shall be required to be satisfied prior to either party having an obligation to enter into the transaction proposed in this term sheet:

(a) The closing of the sale of the Facility and the Danskammer Units from Dynegy to Helios shall have been concluded in accordance with the Bankruptcy Sale Order and the terms of the Asset Purchase Agreement (both as modified by order of the Bankruptcy Court date October 30, 2013 (the "Bankruptcy Closing");

(b) The completion of a transaction between MEA, its affiliates and Helios pursuant to which the Facility and the Danskammer Units are placed into a project entity which will be responsible for the salvage or repowering of the Facility and the Danskammer Units, which transaction is contemplated to be completed within [forty-five (45) calendar days] of the date of the Bankruptcy Closing (the "Project Transaction"); and

(c) If the Facility and the Danskammer Units are to be repowered, Central Hudson does not agree to the reconnection of the natural gas lines feeding the Danskammer Units such that, at a minimum, the Facility is capable of receiving a volume of natural gas sufficient to support the operation of Danskammer Units 1 and 2.

In the event any one or all of the foregoing conditions is not satisfied, the parties agree that they will not enter into the transaction or, if documentation for the transaction has been completed, the transaction may be terminated and, thereafter, neither party will have any obligations or liabilities to the other party.

The parties agree to keep this term sheet and the matters contemplated by it confidential save as may be required to be disclosed pursuant to any applicable law or as may be required by any applicable regulatory authority. No disclosure of this term sheet or such matters contemplated by this term sheet shall be made to any third party other than the party's advisers, or with the prior written consent of the

A-5

*CONFIDENTIAL*
*NOVEMBER 1, 2013*

other party. Neither party shall make any announcement or other public statement regarding this term sheet or the possibility of the parties entering into the transaction set forth herein, save and except to the extent any such public statement is required under applicable law or by any applicable governmental authority.

**SIGNATURE OF PARTIES**

| | |
|---|---|
| Paul E. Haering VP | Andrew Davis - VP |
| 11/1/13 | 11/1/2013 |
| **Central Hudson Gas and Electric Corp.** | **Mercuria Energy America, Inc.** |

**A-6**