*14-1786 (L)*
*Central Hudson Gas & Electric Corp. v. FERC*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

————————————

August Term, 2014

Argued: September 12, 2014
Decided: April 2, 2015

Docket Nos. 14-1786 (L), 14-1830 (Con), 14-2130 (Con), 14-2248 (Con)

————————————

CENTRAL HUDSON GAS & ELECTRIC CORP., PEOPLE OF THE STATE OF NEW YORK,
PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, NEW YORK POWER
AUTHORITY, NEW YORK STATE ELECTRIC AND GAS CORPORATION, ROCHESTER GAS
AND ELECTRIC CORPORATION,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent,*

ENTERGY NUCLEAR POWER MARKETING, LLC, NRG POWER MARKETING LLC,
GENON ENERGY MANAGEMENT, LLC, ARTHUR KILL POWER LLC, ASTORIA GAS
TURBINE POWER LLC, DUNKIRK POWER LLC, NRG BOWLINE LLC, HUNTLEY POWER
LLC, OSWEGO HARBOR POWER LLC, INDEPENDENT POWER PRODUCERS OF NEW
YORK, INC. (IPPNY),

*Intervenors.*

1

———————————————

Before:      LIVINGSTON and DRONEY, *Circuit Judges*; NATHAN, *District Judge*.[*]

Petitioners challenge four orders of the Federal Energy Regulatory Commission approving the New York Independent System Operator's creation of a new capacity zone and ordering the implementation of a demand curve for that capacity zone. Petitioners argue that the orders are arbitrary and capricious, unsupported by substantial evidence, and will result in rates that are not just and reasonable. We disagree and therefore deny the petitions for review.

> RAYMOND B. WUSLICH, Winston & Strawn LLP, Washington, DC, *for Petitioners Central Hudson Gas & Electric Corp., New York Power Authority, New York State Electric and Gas Corporation, and Rochester Gas and Electric Corporation.*
>
> Paul Colbert, Associate General Counsel-Regulatory Affairs, Central Hudson Gas & Electric Corp., Poughkeepsie, NY, *for Petitioner Central Hudson Gas & Electric Corp.*
>
> Glenn D. Haake, Principal Attorney, New York Power Authority, Albany, NY, *for Petitioner New York Power Authority.*
>
> R. Scott Mahoney, General Counsel, Iberdrola USA, Inc., Binghamton, NY, *for*

———————————————

[*]The Honorable Alison J. Nathan, of the United States District Court for the Southern District of New York, sitting by designation.

2

*Petitioners New York State Electric and Gas Corporation, and Rochester Gas and Electric Corporation.*

JONATHAN D. FEINBERG, Solicitor, Public Service Commission of the State of New York (Kimberly A. Harriman, General Counsel, John C. Graham, Assistant Counsel, and Nelli Doroshkin, Assistant Counsel, *on the brief*), *for Petitioners Public Service Commission of the State of New York and People of the State of New York.*

ROBERT H. SOLOMON, Solicitor, Federal Energy Regulatory Commission, Washington DC (David L. Morenoff, Acting General Counsel, Lisa B. Luftig and Karin L. Larson, Attorneys, *on the brief*), *for Respondent Federal Energy Regulatory Commission.*

JOHN S. MOOT, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC (Karis Anne Gong, *on the brief*), *for Intervenor Entergy Nuclear Power Marketing, LLC.*

David B. Johnson, Read and Laniado, LLP, Albany, NY, *for Intervenor Independent Power Producers of New York, Inc.*

Victoria L. Smith, Stinson Leonard Street LLP, Kansas City, MO (Abraham Silverman and Cortney Madea, NRG Energy, Inc., Princeton, NJ, *on the brief*), *for Intervenors*

3

*NRG Power Marketing LLC, GenOn Energy Management, LLC, Arthur Kill Power LLC, Astoria Gas Turbine Power LLC, Dunkirk Power LLC, NRG Bowline LLC, Huntley Power LLC, and Oswego Harbor Power LLC.*

_____

DEBRA ANN LIVINGSTON, *Circuit Judge*:

In this appeal, two groups of Petitioners challenge four orders issued in 2013 and 2014 by the Federal Energy Regulatory Commission ("FERC"). The challenged orders approved a proposal by the New York Independent System Operator ("NYISO") to create a new wholesale electric power "capacity zone" comprising certain areas of Southeastern New York, including the lower Hudson Valley (the "Lower Hudson Valley Zone"). The orders represent the culmination of a multi-year process during which NYISO, at FERC's direction, sought to identify areas of New York in which customers received power from suppliers located on the other side of a "transmission constraint" in the electrical grid. Because of the way New York's capacity markets work (as we explain later in this opinion), NYISO concluded that the financial incentives for capacity resources in the transmission-constrained area that became the Lower Hudson Valley Zone were inadequate, jeopardizing the reliability of the grid for customers there. FERC's approval of the Lower Hudson

4

Valley Zone, along with a new "demand curve" that NYISO uses to set capacity prices for the zone, was designed to address this potential reliability problem by providing more accurate price signals to in-zone resources. For customers in the new zone, however, the creation of the new zone was expected to result in higher prices.

The first group of Petitioners in this case comprises Central Hudson Gas & Electric Corp., New York Power Authority, New York State Electric and Gas Corporation, and Rochester Gas and Electric Corporation ("Utility Petitioners"). The second group comprises the People of the State of New York and the New York Public Service Commission ("NYPSC") ("New York Petitioners"). The essence of Petitioners' claims is that FERC failed adequately to justify the new, higher prices expected to result from the creation of the Lower Hudson Valley Zone, particularly without a "phase-in" of the new zone and its demand curve to soften the impact. Accordingly, Petitioners claim that the challenged orders are arbitrary and capricious, are unsupported by substantial evidence, and disregard FERC's statutory mandate to ensure that rates are "just and reasonable." 16 U.S.C. § 824d(a). For the reasons set forth below, we disagree, and we therefore deny the petitions for review.

## BACKGROUND

Due to the technical nature of the FERC orders that we are called on to review, we first discuss the characteristics of the capacity market in New York, as well as the history behind NYISO's proposal to create the new Lower Hudson Valley Zone, before describing the challenged orders.

### A. New York's Capacity Market for Wholesale Electric Power

In some regions of the United States, including New York, certain functions involving the coordination, control, and operation of the wholesale electric transmission grid and markets for wholesale electric power are administered by organizations known as Regional Transmission Organizations ("RTOs") or Independent System Operators ("ISOs"). Around the turn of this century, FERC formally encouraged the formation of these organizations through several orders that restructured wholesale transmission and energy markets. *See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utils.*, Order No. 888, F.E.R.C. Stats & Regs. ¶ 31,036 (1996), *order on reh'g*, Order No. 888-A, F.E.R.C. Stats & Regs. ¶ 31,048 (1997), *order on reh'g*, Order 888-B, 81 F.E.R.C. ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 F.E.R.C. ¶ 61,046 (1998), *aff'd in relevant part*,

6

*Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002); *Regional Transmission Orgs.*, Order No. 2000, F.E.R.C. Stats. & Regs. ¶ 31,089 (1999), *on reh'g*, Order No. 2000-A, F.E.R.C. Stats. & Regs. ¶ 31,092 (2000) (codified at 18 C.F.R. § 35.34).  As part of their administration of these markets, RTOs and ISOs must, pursuant to the Federal Power Act ("FPA"), obtain FERC's approval of proposed rules and regulations affecting rates for the sale of electric energy, and FERC must ensure that these rules and regulations are "just and reasonable" and result in "just and reasonable" rates. 16 U.S.C. § 824d.  While many RTOs and ISOs in the country have authority over areas whose boundaries cross state lines, New York has its own ISO (i.e., NYISO), which is responsible for the reliable operation of New York's high-voltage transmission grid and administers bulk power markets in New York.

One function that NYISO performs is administering a "capacity market" for wholesale electric power.  Installed capacity is "the amount of electricity that [a] producer can supply at a given time."  *Simon v. KeySpan Corp.*, 694 F.3d 196, 199 (2d Cir. 2012); *see also Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 479 (D.C. Cir. 2009) ("'Capacity' is not electricity itself but the ability to produce it when necessary.").  Capacity markets are a tool that some RTOs and ISOs use to help

7

ensure that there is a reliable and adequate supply of electric power. In a capacity market, suppliers sell a commitment to produce electric energy if called upon to do so during a specified future time period, rather than electric energy itself. NYISO's capacity market is implemented chiefly through monthly mandatory spot auctions, which are conducted a short time in advance of the month for which capacity is being supplied. *See* NYISO Market Administration and Control Area Services Tariff [hereinafter "NYISO Services Tariff"] §§ 5.13.3, 5.14.1.

NYISO's capacity market is divided into "capacity zones." Prior to the orders at issue here, the capacity market was divided into three different capacity zones: the Long Island Capacity Zone (covering Nassau and Suffolk Counties), the New York City Capacity Zone (covering all of New York City), and the New York Control Area (covering the entire state, including both the Long Island Capacity Zone and the New York City Capacity Zone). While the amount of capacity supply in each zone is determined by market actors, the demand for capacity in each zone is administratively determined by NYISO. The administratively determined demand for a given region is known as that region's demand curve. The point at which the supply curve intersects with the administratively determined demand curve is the market clearing price. All suppliers whose bids "clear" the market are paid the

8

clearing price, regardless of the price of each specific supply bid.  Explaining the method by which NYISO sets the demand curve for each region requires some additional background on the way in which reliability is regulated in New York.

While NYISO administers New York's capacity market, reliability is also regulated by a separate entity, the New York State Reliability Council ("NYSRC"). NYSRC periodically calculates a figure called the installed reserve margin, which is an amount of power that must be procured for New York as a whole in addition to the amount needed for peak customer demand.  It sets this margin at a level necessary to prevent a loss of load event—i.e., a system failure—from occurring, on average, more than once every ten years.  *Keyspan-Ravenswood*, 474 F.3d at 806-07. The installed reserve margin for New York is currently 18 percent of the amount of energy needed for peak consumer demand.

To achieve the installed reserve margin set by NYSRC, NYISO sets an installed capacity requirement for New York, which is the specific amount of megawatts necessary to meet peak demand plus the installed reserve margin.  For transmission-constrained regions within New York, NYISO sets location-specific installed capacity requirements.  NYISO also determines the net cost of new entry for each capacity zone.  This number is calculated to equal the cost of constructing

a new "peaking" plant—i.e., a plant that runs only during times of peak demand—in the zone, minus such a plant's revenues from energy and ancillary services.

These figures—installed capacity and net cost of new entry—help NYISO determine the demand curve for each capacity zone: the demand curve is designed to procure, over time, an amount of capacity equal to the installed capacity requirement for each zone at a price equal to the net cost of new entry for that zone. *See Centralized Capacity Mkt. Design Elements*, F.E.R.C. Docket No. AD13-7-000, Commission Staff Report, at 7 (Aug. 23, 2013) (explaining that capacity markets are designed to achieve the planning reserve margin at a price equal to the net cost of new entry); NYISO Services Tariff § 5.14.1.2; *see also* J.A. 2782 (describing the demand curves in New York's capacity zones). Once every three years, NYISO sets separate demand curves for each region for each of the following three years. *N.Y. Indep. Sys. Operator, Inc.*, 143 F.E.R.C. ¶ 61,217 at P 2 (2013); *see* J.A. 1479.

For each capacity zone except the New York Control Area, NYISO also requires a certain amount of capacity (the exact amount is different for each zone) to be supplied from resources located within the zone. These requirements are called locational minimum installed capacity requirements ("LCRs"). The logic is

10

that LCRs must be set for certain capacity zones because even if the overall grid would otherwise have adequate reserves, a particular zone may risk a blackout if those reserves cannot reach the zone due to a transmission constraint.

NYISO's capacity market was originally created after FERC ordered NYISO to develop a proposal to implement a capacity market in 1999. *See Cent. Hudson Gas & Elec. Corp.*, 88 F.E.R.C. ¶ 61,138 at 61,393 (1999). FERC subsequently approved major elements of NYISO's capacity market design, *see N.Y. Indep. Sys. Operator, Inc.*, 108 F.E.R.C. ¶ 61,309 (2004), including its use of an administratively determined downward-sloping demand curve, *see N.Y. Indep. Sys. Operator, Inc.*, 103 F.E.R.C. ¶ 61,201 (2003). While New York's capacity market has historically been divided into the Long Island Zone, New York City Zone, and New York Control Area, in 2009 FERC ordered "NYISO [to] work with stakeholders to address dynamic changes to the New York Control Area that may warrant the creation of additional capacity zones within the NYISO market." *N.Y. Indep. Sys. Operator, Inc.*, 127 F.E.R.C. ¶ 61,318 at P 53 (2009). FERC stated that "[t]he establishment of criteria for the addition of zones will facilitate their development and allow market participants to assess the effect on their interconnected projects." *Id.*

11

**B. The New Zone Criteria Orders**

In January 2011, NYISO submitted a filing addressing the creation of new capacity zones in compliance with FERC's 2009 Order. *N.Y. Indep. Sys. Operator, Inc.*, F.E.R.C. Docket No. ER04-449, Compliance Filing (Jan. 4, 2011). NYISO proposed two pass/fail criteria for determining whether or not to create a new capacity zone. *See N.Y. Indep. Sys. Operator, Inc.*, 136 F.E.R.C. ¶ 61,165 at PP 5-6 (2011) ("New Zone Criteria Order"). The first criterion NYISO proposed was a "highway capacity deliverability test," which was designed to assess whether transmission into a potential new zone was constrained. *Id.* at P 5. A transmission "highway" is a bulk electric transmission facility.[1] A highway transmission constraint occurs when electric power cannot be transmitted from where it is generated to where it is needed due to congestion on a transmission highway. The second criterion was a "reliability criterion," which would assess the reliability of the bulk transmission network in the potential new zone by simulating whether certain contingency scenarios would result in a deficiency of energy resources in the zone. *Id.* at P 6. NYISO proposed that once it identified a new capacity zone based on these criteria,

---

[1] NYISO defines a "Highway" as any 115 kV or higher transmission facility. *Id.* at P 5 n.8.

12

it would engage in further analysis of the implications of the new capacity zone on reliability and energy costs for customers in the zone. *Id.* at P 7.

FERC addressed NYISO's January 2011 filing in its New Zone Criteria Order. FERC ruled that NYISO's specific methodology for the highway capacity deliverability test was flawed. *Id.* at P 52. Accordingly, it ordered NYISO to conduct a test for detecting the presence of transmission constraints using a different methodology, and to file proposed tariff changes incorporating the as-modified test. *Id.* at P 52-58. FERC later clarified the methodology of this test in an order on clarification. *See N.Y. Indep. Sys. Operator, Inc.*, 137 F.E.R.C. ¶ 61,229 (2011) ("New Zone Criteria Order on Clarification").

In the New Zone Criteria Order, FERC also rejected NYISO's proposed reliability criterion, finding that it "may improperly result in a new capacity zone not being created when one is necessary." New Zone Criteria Order at P 60. If the highway capacity deliverability test were satisfied on the basis of an identified transmission constraint, but a new zone was not created because the reliability criterion was not satisfied, an energy resource could enter bids in a zone's capacity auction even though the transmission constraint would prevent the energy generated by that resource from reaching customers in the constrained area of the

13

zone.  *Id.*  In that event, FERC reasoned, "price signals sent to the constrained and unconstrained areas would not accurately signal the relative needs for and values of capacity in the two areas of the broad zone."  *Id.*

Some commenters in the New Zone Criteria proceedings suggested that, in addition to setting forth a method for creating new capacity zones, FERC should also require NYISO to provide a process for the elimination of capacity zones.  *Id.* at PP 16, 70.  FERC, however, declined to do so.  *Id.* at P 70.

In accordance with FERC's New Zone Criteria Order and New Zone Criteria Order on Clarification, NYISO made a compliance filing proposing tariff changes to implement the criterion for creating new zones based on the transmission constraint test.  *See N.Y. Indep. Sys. Operator, Inc.*, 140 F.E.R.C. ¶ 61,160 at PP 14-18 (2012) ("New Zone Criteria Compliance Order").  NYISO proposed starting the new capacity zone process by conducting a study in which it would apply the FERC-approved "highway" test for identifying transmission constraints.  *Id.* at P 9.  If the study identified such a constraint, NYISO would then identify the boundary for a new capacity zone.  *Id.* at P 39.  NYISO also stated that any new capacity zone would require a new LCR.  *Id.* at P 14.  NYISO proposed that it would determine the LCR for a new capacity zone no later than March 1 of each year in which it

14

administratively determines demand curves for its capacity zones. *Id.* at P 16. FERC approved NYISO's filing. *Id.* at P 1.

### C. The Orders Under Review

Applying the New Zone Criteria Orders, NYISO proposed the creation of the Lower Hudson Valley Zone and a demand curve for the new zone. In response, FERC issued the four orders that are the subject of this appeal. In one pair of orders, it approved the creation of the new Lower Hudson Valley Zone, *see N.Y. Indep. Sys. Operator, Inc.*, 144 F.E.R.C. ¶ 61,126 (2013) ("Zone Order"), *on reh'g, N.Y. Indep. Sys. Operator, Inc.*, 147 F.E.R.C. ¶ 61,152 (2014) ("Zone Rehearing Order"). And in a second pair of orders, it approved the establishment of a new demand curve for the Lower Hudson Valley Zone. *N.Y. Indep. Sys. Operator, Inc.*, 146 F.E.R.C. ¶ 61,043 (2014) ("Demand Curve Order"), *on reh'g, N.Y. Indep. Sys. Operator, Inc.*, 147 F.E.R.C. ¶ 61,148 (2014) ("Demand Curve Rehearing Order").

#### 1. Zone Orders

NYISO filed its tariff revisions to establish the Lower Hudson Valley Zone on April 30, 2013. Along with its tariff revisions, NYISO provided a report laying out the results of its study, which showed that the transmission highway providing power from certain NYISO "load zones" in Upstate New York into load zones

downstate was constrained. NYISO's filing accordingly proposed creating the Lower Hudson Valley Zone, and laid out the timing and sequence of steps required to do so.

NYISO set the boundaries for the Lower Hudson Valley Zone to encompass all of the NYISO load zones located to the south of the constrained transmission interface, except for Load Zone K, which covers Nassau County and Suffolk County in Long Island. Load Zone J, comprising New York City, would be part of the new Lower Hudson Valley Zone, but it would also continue to be its own capacity zone, with a separate LCR and demand curve. NYISO's filing did not include provisions to govern the potential future elimination of the Lower Hudson Valley Zone. Nor did NYISO's tariff provisions provide for a phase-in of the new zone.

NYISO proposed that the demand curve for the Lower Hudson Valley Zone would be filed on November 30, 2013, and would become effective May 1, 2014. In the Zone Order, FERC accepted all of NYISO's proposed tariff revisions creating the new Lower Hudson Valley Zone. Zone Order at P 1. FERC rejected protestors' contentions that the new zone's boundary was not just and reasonable. It also concluded that it was unnecessary for NYISO to propose a mechanism for eliminating the Lower Hudson Valley Zone upon the elimination of the transmission

16

constraint on which the zone was premised, and declined to require a phase-in of the new zone. Various parties petitioned for rehearing of the Zone Order and FERC denied rehearing on all the issues which are now subject to appeal.[2] *See* Zone Rehearing Order at PP 1, 13-20, 27, 44-45.

## 2. Demand Curve Orders

In accordance with FERC's Zone Order, NYISO filed tariff revisions proposing a new demand curve for the Lower Hudson Valley Zone on November 27, 2013. Unlike its tariff filing in the Zone proceeding, NYISO's proposed tariff revisions included provisions that would phase in the demand curve for the new Lower Hudson Valley Zone to help soften the impact of the higher capacity prices that were likely to result from the new zone's creation. NYISO's proposed phase-in calculated the demand curve for the first year of operation of the Lower Hudson Valley Zone using a reference value for the cost of a new peaking plant of only 76.06 percent of what it otherwise would be, and calculated the demand curve for the second year of operation using a value of 88.03 percent of what it otherwise would be. FERC accepted NYISO's tariff filing but rejected its phase-in proposal. Demand Curve

---

[2] FERC did grant rehearing on one narrow issue regarding market mitigation measures, but that is not being appealed here. *See* Zone Rehearing Order at PP 33-37.

17

Order at P 165. FERC later denied rehearing of its Demand Curve Order on the same day that it issued its Zone Rehearing Order. Demand Curve Rehearing Order at P 1.

## D. Petitions for Review

In this appeal, Petitioners argue that the Zone Order, Zone Rehearing Order, Demand Curve Order and Demand Curve Rehearing Order are not supported by reasoned decisionmaking and substantial evidence. They make five principal arguments against FERC's orders: (1) FERC did not adequately justify its conclusion that consumers would benefit from the creation of the new Lower Hudson Valley Zone and the implementation of its associated demand curve; (2) FERC failed to adequately support its conclusion that implementing the new zone without a phase-in of its demand curve would result in just and reasonable rates; (3) in creating the new zone, FERC improperly ignored evidence regarding New York's transmission upgrade initiatives; (4) FERC improperly failed to set forth criteria for the potential elimination of the Lower Hudson Valley Zone after the transmission constraint no longer exists; and (5) FERC did not demonstrate that the increases in rates arising from the new zone would "reflect to some degree the costs actually caused by the customer who must pay them." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d

18

1361, 1368 (D.C. Cir. 2004) (quoting *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992)).

The orders under review are defended not only by FERC, but also by two sets of intervenors: Entergy Nuclear Power Marketing, LLC ("Entergy") and Independent Power Producers of New York, Inc. (together, "Joint Intervenors"), and a group of subsidiaries of NRG Energy, Inc. ("NRG").[3]

## DISCUSSION

### A. Jurisdiction

Before turning to the merits of Petitioners' arguments, we address Joint Intervenors' contention that we lack jurisdiction over New York Petitioners' petition for review.

The FPA requires an aggrieved party to seek rehearing of a FERC order by the Commission itself before the party may obtain judicial review of that order. Specifically, the statute provides that no entity may bring a proceeding to review any FERC order "unless such entity shall have made application to the Commission for a rehearing thereon." 16 U.S.C. § 825*l*(a). It also provides that a party must file

---

[3] These companies are NRG Power Marketing LLC; GenOn Energy Management, LLC; Arthur Kill Power LLC; Astoria Gas Turbine Power LLC; Dunkirk Power LLC; NRG Bowline LLC; Huntley Power, LLC; and Oswego Harbor Power LLC.

19

a petition for review in an appropriate federal Court of Appeals within 60 days after "the order of the Commission upon the application for rehearing," and that "[n]o objection to the order of the Commission shall be considered by [a] court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."  *Id.* § 825*l*(b). Under these provisions, courts are barred from considering a party's objections if the objection either (1) amounts to collateral attack on an earlier FERC order, *see Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 824-25 (D.C. Cir. 2008), or (2) was not specifically raised by the party in a petition for rehearing (provided that there is no reasonable ground for its failure to do so), *see Save Our Sebasticook v. FERC*, 431 F.3d 379, 381 (D.C. Cir. 2005).

Joint Intervenors argue that we lack jurisdiction over New York Petitioners' objections to the Zone Order because those objections amount to impermissible collateral attacks on the New Zone Criteria Orders and (with one exception) have been waived by virtue of New York Petitioners' failure to preserve them in a petition for rehearing.  The D.C. Circuit has long held that the bars erected by the FPA's mandatory-rehearing provisions are jurisdictional in nature, *see Pac. Gas & Elec. Co.*, 533 F.3d at 825; *Save Our Sebasticook*, 431 F.3d at 381, and we will assume that the

20

D.C. Circuit is correct. Accordingly, we will consider ourselves obligated to evaluate Joint Intervenors' collateral-attack and waiver arguments before turning to the merits of Petitioners' objections. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-95 (1998).

### 1. Collateral Attack

Joint Intervenors contend that by authorizing the creation of the Lower Hudson Valley Zone in the Zone Orders, FERC merely evaluated NYISO's proposal against requirements that had already been imposed by the previously issued New Zone Criteria Orders. In other words, it was the New Zone Criteria Orders (and not the Zone Orders) that required NYISO to use the "highway" deliverability test for determining the necessity of establishing a new zone; in the Zone Orders, FERC merely approved NYISO's application of that test and the resulting creation of the Lower Hudson Valley Zone. On this basis, Joint Intervenors claim that New York Petitioners' challenges to the creation of the Lower Hudson Valley Zone—which New York Petitioners frame as challenges to the Zone Orders—are actually impermissible collateral attacks on the New Zone Criteria Orders. We disagree.

When a petitioner's objection is aimed not at the order purportedly under review but instead at an earlier FERC order, it is barred as a collateral attack on the

21

earlier order unless (1) the objection attacks FERC's constitutional or statutory authority, (2) FERC has "effectively reopened" the earlier order, or (3) the earlier order failed to place parties on notice of what would be required. *Sacramento Mun. Util. Dist. v. FERC*, 428 F.3d 294, 298-99 (D.C. Cir. 2005). Contrary to Joint Intervenors' argument, New York Petitioners' objections—with one possible exception described below—are aimed at the Zone Orders themselves, and not at the New Zone Criteria Orders.

In cases where the D.C. Circuit has held that a petitioner's challenge is an impermissible collateral attack on a prior FERC order, the challenge has involved a significantly more direct attack on the prior order than do the bulk of New York Petitioners' objections here. In *Sacramento*, for example, a municipal utility district asserted a right of first refusal for long-term firm transmission service when its transmission contract with certain utilities was set to expire. 428 F. 3d at 295, 298. The utilities demurred, and the district filed a complaint with FERC. *Id.* Earlier, however, FERC had ordered entities to take transmission service under the California ISO's tariff after their long-term transmission contracts expired; in doing so, it "explicitly approved the absence" of a right-of-first-refusal provision in that tariff. *Id.* at 297. Accordingly, the district's challenge was effectively a direct attack

22

on the earlier FERC order that approved the California ISO's tariff, so it could not be raised in a later proceeding. *Id.* at 298-99. In *Pacific Gas & Electric Co. v. FERC*, also cited by Joint Intervenors, the petitioner challenged orders requiring the California ISO, and not the petitioner, to conduct interconnection studies for new resources. 533 F.3d 820, 824 (D.C. Cir. 2008). But a prior order had made clear that the "ISO conducts all studies" in a region with an ISO, and the relevant area was plainly in the California ISO's jurisdiction. *Id.* at 825. In both cases, then, the petitioner's challenge was squarely foreclosed by the prior order and therefore could not succeed except by undermining the prior order.

Here, by contrast, New York Petitioners' objections (again, with one possible exception) do not attack the general principles set forth in the New Zone Criteria Orders. Instead, they concern the specific application of those principles to the creation of the Lower Hudson Valley Zone—an application that FERC could not have opined on in the New Zone Criteria Orders. It may be true that New York Petitioners would prefer FERC to have approved, in the New Zone Criteria Orders, criteria other than the "highway" criterion that it ultimately settled on—for example, ones based on system reliability or consumer economic impacts. But New York Petitioners are not challenging FERC's adoption of the "highway" criterion, nor do

23

their arguments necessarily call the adoption of that criterion into question. Instead, they argue that the creation of the Lower Hudson Valley Zone will, under the circumstances, result in unjust and unreasonable rates, and that the challenged FERC orders are arbitrary and capricious. When the New Zone Criteria Orders were issued, it was clear that, while NYISO would have to file for the creation of a new zone if the test prescribed by the New Zone Criteria Orders were satisfied, FERC would still have to approve the new zone pursuant to its statutory obligation to ensure that rates and the rules and regulations affecting them are "just and reasonable." 16 U.S.C. § 824d(a), (c). New York Petitioners' arguments that FERC has not adequately made such a demonstration therefore do not constitute collateral attacks on the New Zone Criteria Orders.

This point can also be understood as an application of the "notice" exception to the prohibition on collateral attacks.[4] *See Sacramento Mun. Util. Dist.*, 428 F.3d at 299. In applying this exception, the D.C. Circuit has said that an objection is a collateral attack on an earlier order "only if a reasonable firm in [petitioners']

---

[4] Indeed, while some D.C. Circuit authority suggests that a failure to put parties on adequate notice opens an exception to the prohibition on collateral attacks, *see Sacramento Mun. Util. Dist.*, 428 F.3d at 299, other cases suggest that the question whether adequate notice has been given is the same as whether the petitioner's argument ranks as a collateral attack in the first place, *see Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1126 (D.C. Cir. 2011); *S. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 44-45 (D.C. Cir. 2005).

position would have perceived a very substantial risk that the [order] meant what the Commission now says it meant." *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1126 (D.C. Cir. 2011) (alterations in original) (quoting *S. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 45 (D.C. Cir. 2005)) (internal quotation mark omitted). The New Zone Criteria Orders would have put New York Petitioners on notice only that NYISO would have to file for the creation of a new zone upon finding a transmission constraint under the test prescribed by those orders—not that the new zone would have the boundaries of the Lower Hudson Valley Zone, nor that FERC would necessarily approve the creation of the Lower Hudson Valley Zone for the reasons that it did. In other words, while Joint Intervenors may be correct that New York Petitioners cannot "claim that [they] lacked adequate 'notice' that the New Zone Criteria Orders would control the creation of the Lower Hudson Valley Zone," Joint Intervenors' Br. at 25, they also had no way of knowing that those orders would be applied to these specific facts in this specific manner.

Indeed, Joint Intervenors never suggest that FERC's approval of the creation of the Lower Hudson Valley Zone was a foregone conclusion under the New Zone Criteria Orders. FERC itself apparently thought that it was not; hence its explanation, in the Zone Order, of why NYISO's proposed creation of the Lower

25

Hudson Valley Zone not only was consistent with and required by NYISO's tariff (as modified by the New Zone Criteria Orders), but also would not result in unjust and unreasonable rates. *See* Zone Order at PP 20-22, 24-25. Put simply, the fact that FERC approved a general process does not suggest an advance determination that applying that process to all potential factual situations would necessarily fulfill its statutory obligation to ensure just and reasonable rates. Because New York Petitioners' challenges are aimed primarily at FERC's just-and-reasonable rate determination, and not at the test imposed by the New Zone Criteria Orders, they are not barred as impermissible collateral attacks on those prior orders.

The one argument advanced by New York Petitioners that might amount to a collateral attack on the New Zone Criteria Orders is their argument that FERC should have required NYISO to put in place criteria for the elimination of the Lower Hudson Valley Zone at the same time that the zone was created. In its first New Zone Criteria Order, FERC explicitly declined to require a process for eliminating zones even as it set up the process for new zone creation. *See* New Zone Criteria Order at P 70 ("[W]e will not expand our compliance directive to require NYISO to define criteria regarding the potential elimination of capacity zones as some commentators have suggested."). Thus, New York Petitioners' argument that

26

"FERC unreasonably declined to establish criteria for eliminating the new zone in the event the transmission constraint is relieved," N.Y. Pet'rs' Br. at 26, is directly at odds with the conclusion reached in that prior order. There may be a distinction between the need for zone elimination procedures in this particular case and the need for such procedures in general, given that New York Petitioners supplied evidence that New York's transmission upgrade initiatives might eliminate the transmission constraint necessitating the Lower Hudson Valley Zone. We need not decide whether this distinction is relevant, however, because FERC has "effectively reopened" the issue. *Sacramento Mun. Util. Dist.*, 428 F.3d at 299.

An agency reopens an issue decided in a previous order—and thus lifts the bar against challenging that decision in a subsequent proceeding—when "in responding to comments the agency uses language that shows that it did in fact reconsider an issue." *Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 150 (D.C. Cir. 1990). Here, FERC reopened the issue of zone elimination in the Zone Order by articulating a different rationale than the one it relied on in the New Zone Criteria Order.

In the New Zone Criteria Order, FERC justified its decision not to require criteria for eliminating new zones based in part on the logic that "[t]he impact of the

27

failure to create a zone where one is needed is much more significant than the impact of a failure to eliminate an existing unneeded zone because an unneeded zone should not experience price separation from the neighboring zones." New Zone Criteria Order at P 70. But in the Zone Order, FERC suggested that its prior reasoning was incorrect, indicating that "price separation may well continue after the constraint leading to a new capacity zone disappears." Zone Order at P 83. FERC went on to conclude that criteria for eliminating the Lower Hudson Valley Zone were nevertheless unnecessary because any such price separation would be an "appropriate" reflection of a zone's relative cost of entry and therefore necessary to attract "adequate resources" to be located within the zone. *Id.* It also relied on new record evidence—an affidavit submitted by NYISO's Dr. David B. Patton—in support of its conclusion. *Id.* & n.91. FERC's revised, and newly supported, explanation for its decision not to require zone elimination criteria shows that the agency "did in fact reconsider" the issue of zone elimination in the Zone Order, and that New York Petitioners' arguments on that subject are not barred by the FPA's prohibition on collateral attacks. *Pub. Citizen*, 901 F.2d at 150.

28

## 2. Failure to Preserve on Rehearing

Joint Intervenors also argue that New York Petitioners waived their challenges to the Zone Orders—with the exception of the argument that New York transmission initiatives made the creation of the Lower Hudson Valley Zone unnecessary—by failing to raise them in a petition for rehearing. FPA's requirement that a party must raise its objections in a petition for rehearing "enables the Commission to correct its own errors, which might obviate judicial review, or to explain why in its expert judgment the party's objection is not well taken, which facilitates judicial review." *Save Our Sebasticook*, 431 F.3d at 381; *see also ASARCO, Inc. v. FERC*, 777 F.2d 764, 774-75 (D.C. Cir. 1985) (examining the Natural Gas Act's identical mandatory-rehearing provision). Thus, to preserve an objection for judicial review, a party must raise it in a request for FERC rehearing "with 'specificity.'" *Allegheny Power v. FERC*, 437 F.3d 1215, 1220 (D.C. Cir. 2006) (quoting *Wisc. Power & Light Co. v. FERC*, 363 F.3d 453, 460 (D.C. Cir. 2004)).

Joint Intervenors point to two objections in particular that they claim New York Petitioners did not preserve: (1) that FERC failed to quantify consumer price impacts and (2) that the creation of the Lower Hudson Valley Zone was not necessary to maintain reliability. We agree that that New York Petitioners failed to

29

raise the first of these objections with sufficient specificity in their petitions for rehearing.

In its request for rehearing of the Zone Order, the NYPSC objected to FERC's conclusion that the benefits of creating the Lower Hudson Valley Zone justified the zone's costs. In essence, the NYPSC argued that FERC had identified only *long*-term benefits from the creation of the Lower Hudson Valley Zone, because even assuming that the zone's creation would eventually "incent new generation" there, those resources would not materialize for several years—particularly in light of state regulatory initiatives that (the NYPSC argued) would alleviate the transmission constraint identified by NYISO. J.A. 1076. Upon the creation of the new zone, however, consumer rates would increase immediately, so FERC's failure to identify short-term benefits of the new zone therefore suggested that the rate increases were unjustified. The NYPSC thus urged FERC to either delay or phase in the rate increases associated with establishing the new zone. But nowhere did it make the specific argument that New York Petitioners do now—i.e., that FERC was obliged to quantify the amount by which consumer rates would increase. *See* N.Y. Pet'rs' Br. at 19 ("Despite FERC's refusal to do so, the FPA requires that it quantify and review the extent of the possible price impacts to ensure that they fall within a reasonable

30

range of rates."). Nor did the NYPSC raise this argument in seeking rehearing of the Demand Curve Order, when it also highlighted FERC's failure to identify short-term benefits from the Lower Hudson Valley Zone in light of ongoing state initiatives, and therefore urged FERC to have NYISO phase in the new zone's demand curve.

We do not intend to suggest that a petitioner may never, in seeking judicial review, supplement an argument raised in its request for rehearing by adding new nuances or framing the argument in a slightly different way. *See, e.g.*, *City of Oconto Falls v. FERC*, 204 F.3d 1154, 1162 n.5 (D.C. Cir. 2000). But the NYPSC's failure even to mention to FERC that quantifying price impacts was required led FERC (quite understandably) not to consider that question at all. For us to address New York Petitioners' argument on the merits would therefore disserve the FPA's purpose of enabling FERC to correct any error in its initial order or explain why, in its considered judgment, there was no error. Accordingly, we conclude that the quantification argument has not been preserved for our consideration. *See Allegheny Power*, 437 F.3d at 1220 (finding that an objection had not been preserved where it was not made specifically in the petitioner's request for rehearing and did not elicit a response from FERC). In light of the foregoing discussion, however, we also conclude that New York Petitioners' more general cost-benefit argument—i.e., that

31

FERC failed to identify non-speculative short-term benefits of creating the Lower Hudson Valley Zone that would justify consumer rate increases—has been adequately preserved.

Joint Intervenors also contend that New York Petitioners failed to preserve their argument that FERC improperly relied on reliability concerns to justify the creation of the Lower Hudson Valley Zone. In its request for rehearing of the Zone Order, the NYPSC raised reliability concerns only in connection with its argument that FERC should establish criteria for NYISO to determine when the Lower Hudson Valley Zone should be eliminated. It pointed out that, in the Zone Order, FERC justified the creation of the new zone based in part on the fact that reliability concerns required locating a certain amount of generation within the zone itself, so higher capacity prices would be justified based on the zone's higher net cost of new entry vis-à-vis other zones. *See* Zone Order at P 26. The NYPSC argued that the "sustained price separation" contemplated by FERC was unjust, and asked FERC to prescribe a process for the elimination of the new zone. J.A. 1083. In the Zone Rehearing Order, however, FERC cited reliability concerns not only as a reason for tolerating price separation, but also in response to the NYPSC's separate argument that the zone should be delayed or phased in: FERC claimed that the accurate price

32

signals created by the new zone would enhance short-term reliability. Zone Rehearing Order at PP 13-16. Perhaps for this reason, New York Petitioners now argue that FERC improperly cited reliability concerns to justify the immediate creation of the new zone—and not just to justify its refusal to require elimination criteria.

New York Petitioners did not specifically argue on rehearing, as they do now, that FERC's decision to *create* the Lower Hudson Valley Zone was erroneous because there was inadequate evidence of a reliability concern. Under the circumstances, however, this failure does not preclude us from addressing the merits of New York Petitioners' argument. To the extent that there is error in FERC's reliance on reliability concerns to justify the immediate establishment of the new zone—as opposed to a delay or a phase-in—New York Petitioners specifically argued on rehearing that the new zone should be delayed or phased in, so the adequacy of FERC's reasoning in rejecting that argument is properly before us. Similarly, to the extent that FERC cited reliability concerns in deciding not to establish elimination criteria for the new zone, that decision also was objected to on reconsideration, *see*

J.A. 1080-83, so we may examine the adequacy of FERC's explanation on that subject, too—including its reliance on reliability concerns.[5]

**B. Whether the Challenged Orders Are Lawful**

We review final FERC orders under the Administrative Procedure Act, which requires an order to be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Green Island Power Auth. v. FERC*, 577 F.3d 148, 158 (2d Cir. 2009) (quoting 5 U.S.C. § 706(2)(A)) (internal quotation marks omitted). An order ranks as arbitrary and capricious if "the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *LaFleur v. Whitman*, 300 F.3d 256, 267 (2d Cir. 2002)) (internal quotation marks omitted). FERC "must examine the relevant data and articulate a satisfactory

---

[5] Joint Intervenors implicitly suggest that the elimination criteria argument is unpreserved by claiming that New York Petitioners' single preserved argument concerns FERC's refusal to take ongoing New York transmission initiatives into account. As noted in the text, however, the elimination criteria argument was raised on rehearing and is therefore properly before us: New York Petitioners devoted an entire section of their rehearing request to the argument that FERC erred in not requiring criteria for the elimination of the Lower Hudson Valley Zone. *See* J.A. 1080-83.

explanation for its action[s] including a 'rational connection between the facts found and the choice[s] made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

FERC's decisions must also be supported by substantial evidence. *See Rochester Gas & Elec. Corp. v. Fed. Power Comm'n*, 344 F.2d 594, 596 (2d Cir. 1965). This requires the record to contain "more than a scintilla but less than a preponderance" of evidence in support of FERC's determination, such that "a reasonable mind might accept [the evidence] as adequate to support [FERC's] conclusion." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)) (internal quotation mark omitted). Under the FPA's judicial review provision, however, "FERC's findings of fact, 'if supported by substantial evidence, shall be conclusive.'" *Green Island Power Auth.*, 577 F.3d at 158 (quoting 16 U.S.C. § 825*l*(b)).

"[W]e afford great deference to [FERC] in its rate decisions." *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008). We also agree with the D.C. Circuit that "[b]ecause issues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the

regulatory mission, our review of whether a particular rate design is just and reasonable is highly deferential." *Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999) (brackets and internal quotation marks omitted).

### 1. Zone Creation

Petitioners contend that FERC did not adequately support its conclusion that the creation of the new Lower Hudson Valley Zone justified the costs imposed by the zone—i.e., its conclusion that the creation of the new zone would ultimately result in just and reasonable rates. We disagree. FERC adequately supported its decision to approve the creation of the Lower Hudson Valley Zone by relying on economic theory.

The D.C. Circuit has held that FERC may permissibly rely on economic theory alone to support its conclusions so long as it has applied the relevant economic principles in a reasonable manner and adequately explained its reasoning. *See, e.g.,* *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 531 (D.C. Cir. 2010) (holding that FERC appropriately made findings based on "'generic factual predictions' derived from economic research and theory . . . given that it explained and applied the relevant economic principles in a reasonable manner" (quoting *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 688 (D.C. Cir. 2000))); *Wis. Pub. Power Inc. v.*

*FERC*, 493 F.3d 239, 260-61 (D.C. Cir. 2007) (holding that FERC's prediction that a given formula for allowing electricity suppliers to recover fixed costs in setting prices would "provide an efficient incentive to invest" was a "reasonable predictive judgment that warrants judicial deference"); *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1008 (D.C. Cir. 1987) (stating that courts should not set aside an agency's "reliance on generic factual predictions merely because they are typically studied in the field called economics"). We agree, and we will therefore consider whether FERC reasonably applied sound economic principles and articulated an adequate explanation for how those principles justified its conclusion.

As FERC explained in the New Zone Criteria Order, the "highway" deliverability test pursuant to which NYISO determined that the Lower Hudson Valley Zone should be created is designed to address reliability concerns that arise due to transmission constraints between different areas of an existing zone. Because NYISO's capacity auctions are zone-wide, capacity resources that bid to supply capacity for a given zone can be located anywhere in the zone. If a transmission constraint exists, "the capacity auction for that zone may accept more capacity in the unconstrained area than can be delivered to the constrained area." New Zone Criteria Order at P 56. Capacity in the unconstrained area may even "displace

capacity located in the constrained area," *id.* at P 56, if, for example, the cost of supplying capacity is lower in the unconstrained area and resources in that area therefore provide lower bids at auction, *see* Zone Rehearing Order at PP 15-16. Under those circumstances, the amount of capacity that is actually deliverable to the constrained area might be "less than the amount needed for reliability." New Zone Criteria Order at P 56. Moreover, failing to pay resources located in the constrained area for their capacity could lead to insufficient capacity supply in the constrained area, jeopardizing long-term reliability. To put it in simple terms, NYISO's auctions award capacity payments to the resources who supply capacity at the lowest cost, and if those payments are going only to cheaper upstate resources that may be unable to actually deliver power to downstate consumers, then downstate resources who *can* deliver power to those consumers might not stay in business. By providing for the creation of a new zone in a way that accounts for transmission constraints, FERC sought to ensure that capacity prices in the constrained area would "be allowed to rise above prices in the unconstrained area, thereby providing stronger incentives to attract and retain capacity needed to meet reliability objectives in the constrained area." *Id.* at P 57.

After NYISO applied the deliverability test prescribed by the New Zone Criteria Orders and sought FERC's approval to create the Lower Hudson Valley Zone in the Zone proceeding, FERC reaffirmed the economic basis for its conclusion that the new zone would lead to just and reasonable rates by generating more accurate price signals. *See* Zone Order at P 24 ("The results of NYISO's application of the . . . Deliverability test demonstrate that a significant transmission constraint currently exists into NYISO's proposed new capacity zone. Any resulting higher capacity prices in the new capacity zone will help to encourage the development of new generation and/or transmission capacity to help alleviate the constraint. Such price changes promote efficient decisions and are not unreasonable."). Indeed, in its request for rehearing in the Zone proceeding, the NYPSC recognized the validity of FERC's economic reasoning, conceding that "creating [the Lower Hudson Valley Zone] could have long-term reliability benefits" and "may eventually incent new generation in that location." J.A. 1076.

We conclude that FERC articulated sound economic principles supporting the creation of the Lower Hudson Valley Zone and satisfactorily explained how those principles justified its conclusion. Accordingly, FERC's determination that the creation of the new zone would lead to just and reasonable rates was adequately

supported, and was not arbitrary and capricious.

New York Petitioners' arguments to the contrary are not persuasive. New York Petitioners claim that the long-term benefits that FERC claims will follow from the accurate price signals generated by the new zone "are merely predictions." N.Y. Pet'rs' Br. at 22. Quoting the D.C. Circuit's decision in *Electricity Consumers Resource Council v. FERC*, they contend that "mere reliance on an economic theory cannot substitute for substantial record evidence and the articulation of a rational basis for [FERC's] decision." 747 F.2d 1511, 1514 (D.C. Cir. 1984). But the D.C. Circuit has since clarified (repeatedly) that FERC's economic argument in *Electricity Consumers* was unavailing not because reliance on economic theory alone is never permissible, but because the court there "was persuaded that the Commission had 'inexplicably distorted' the theory that it claimed to apply." *Associated Gas. Distribs.*, 824 F.2d at 1008 (quoting *Elec. Consumers*, 747 F.2d at 1514); *see also Sacramento Mun. Util. Dist.*, 616 F.3d at 531 ("Neither *Electric* [sic] *Consumers* nor any other case law prevents the Commission from making findings based on generic factual predictions derived from economic research and theory.") (internal quotation marks and citation omitted). Here, as we have explained, FERC has not distorted economic theory in

reasoning that the creation of the Lower Hudson Valley Zone will ensure accurate price signals and thereby alleviate the risk of reliability problems in the long run.

Petitioners also argue that FERC failed to consider the new zone's impact on consumer rates. FERC's orders, however, show that it did consider the new zone's impact on consumer rates. *See, e.g.*, Zone Rehearing Order at P 17 ("The reality is that, in the short run, consumers may pay more but doing so is necessary to provide the appropriate price signals to incent developers to build or restore capacity and address a long-standing problem. . . . The Commission hopes to emphasize that decision-making based only on avoiding price increase in the short-term could threaten reliability and price stability in the long-term."). FERC also explained that rates in the Lower Hudson Valley Zone would be likely to decrease over time "[a]s more capacity locates in the new capacity zone." *Id.* (And, as we have explained, New York Petitioners failed to preserve their argument that FERC was required to quantify consumer benefits.)

"[T]he FPA has multiple purposes in addition to preventing excessive rates, including protecting against inadequate service and promoting the orderly development of plentiful supplies of electricity." *Consol. Edison Co. of N.Y., Inc. v. FERC,* 510 F.3d 333, 342 (D.C. Cir. 2007) (citations and internal quotation marks

omitted). In determining whether rates are just and reasonable, FERC is charged with balancing these competing interests, *see, e.g.*, *New Eng. Power Generators Ass'n, v. FERC*, 757 F.3d 283, 298 (D.C. Cir. 2014), and we are not persuaded that there is anything unreasonable in FERC's conclusion that higher prices were necessary to ensure reliability by generating accurate price signals in the long run.

### 2. Phase-In

Apart from challenging FERC's balancing of higher consumer costs against the long-term benefits of generating more accurate price signals, Petitioners also object to FERC's decision to reject a phase-in of the Lower Hudson Valley Zone and the rate increases portended by the new zone's demand curve. This issue arose in both the Zone proceeding and the Demand Curve proceeding. In the Zone proceeding, NYISO's proposal did not call for a phase-in of the new zone, but a group of New York Transmission Owners (including Utility Petitioners) protested that the zone should be phased in to soften the impact of rate increases. *See* Zone Order at P 28. In the Demand Curve proceeding, NYISO proposed to phase in the demand curve for the new zone by discounting the demand curve to 76.06 percent of the cost of new entry in the first year and 88.03 percent in the second year, and Petitioners urged FERC to adopt this aspect of NYISO's proposal. *See* Demand

42

Curve Order at PP 141-47, 155-56. In both proceedings, FERC rejected the phase-in, explaining that "a phase-in would delay the capacity market's ability to send more efficient investment price signals to attract and maintain sufficient capacity to meet local demand." Demand Curve Order at P 164; *see also* Zone Order at P 31; Zone Rehearing Order at PP 13-20; Demand Curve Rehearing Order at P 59-65.

FERC rejected Petitioners' arguments that the years-long timeframe for the construction of new capacity resources in the Lower Hudson Valley Zone implied that short-term increases in capacity prices would be irrelevant to FERC's goal of maintaining adequate capacity supply in the new zone. FERC explained that accurate price signals would not only create the proper long-term incentives for building new capacity resources, but would also affect "shorter term supply responses, *i.e.*, demand response and repowering options."[6] Demand Curve Order at P 164; *see also* Zone Rehearing Order at P 20 (reiterating FERC's finding that "a phase-in could adversely affect incentives to supply shorter term capacity responses, such as demand response and repowering options."). Additionally, FERC asserted

---

[6] Demand response is "reduction in the consumption of electric energy by customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy." *Elec. Power Supply Ass'n v. FERC*, 753 F.3d 216, 220 (D.C. Cir. 2014) (quoting 18 C.F.R. § 35.28(b)(4)) (internal quotation marks and emphasis omitted).

that accurate short-term prices would "guide efficient investment decisions to add *or retire* capacity resources." Demand Curve Order at P 162 (emphasis added); *see also* Zone Rehearing Order at P 16 (warning that failure to create a new zone would "encourage[] premature capacity retirements in the import-constrained area because of the area's inefficiently low prices"); Demand Curve Rehearing Order at P 61 (same). Thus, in FERC's view, an immediate increase in prices would, in fact, help alleviate short-term reliability concerns by properly incentivizing demand response and repowering options and by discouraging early retirement of existing resources; none of these sources of capacity would require years to come on line.

Petitioners argue that FERC's rejection of a phase-in resulted in unjust and unreasonable rates and was not supported by substantial evidence.[7] They contend that there was insufficient evidence of a short-term reliability needs in the new zone,

---

[7] FERC and Joint Intervenors assert that, because a phase-in would require a waiver of NYISO's tariff, FERC acted within its discretion in denying the phase-in. They argue that it was NYISO's burden to show that a phase-in of the demand curve was just and reasonable. Petitioners counter that FERC nevertheless maintained the burden of showing that implementing the Lower Hudson Valley Zone without a phase-in would result in just and reasonable rates, and that FERC was therefore required to show that implementing the full demand curve immediately would provide cost-justified benefits to consumers. As explained in the text, we conclude that even if FERC were required to show that implementing the Lower Hudson Valley Zone without the phase-in would result in just and reasonable rates, it has satisfied this burden. Thus, we do not decide whether FERC had such a burden.

44

and they accuse FERC of failing to identify short-term supply responses whose decisions would actually be affected by higher short-term prices.

In this context, Petitioners are arguably on stronger footing in suggesting that FERC's reliance on economic analysis alone is insufficient.  As we have discussed, in describing the long-term benefits of creating the Lower Hudson Valley Zone, FERC persuasively explained why economic theory dictated that reliability concerns are likely to arise in a transmission-constrained area and that creating a new demand curve for the constrained area would appropriately incentivize the supply of capacity within that area on an aggregate level.  But in zeroing in on specific categories of capacity suppliers that would respond to short-term incentives and mitigate short-term reliability needs, FERC necessarily assumed that such suppliers existed and would respond to higher prices, and that a short-term reliability need required an immediate response.  However, even accepting for the sake of argument Petitioners' position that FERC was required to point to evidence supporting its factual premises, we conclude, for the following reasons, that the evidence was sufficient to justify FERC's rejection of the phase-in.

NYISO asserted, in its proposed tariff revisions in the Zone proceeding, that the "reliability needs" that the new zone would address "are becoming increasingly

45

significant." J.A. 129. FERC pointed to this statement, as well the 2012 "State of the Market" report cited by NYISO, in determining that a lack of accurate price signals in the constrained zone was already leading to a decrease in available capacity within the zone. *See* Zone Order at P 35; *see also* Demand Curve Order at P 162 (declining to "reconsider" the Zone Order's decision not to adopt a phase-in). The 2012 State of the Market Report supported FERC's conclusion. It suggested that the new zone should have been created even sooner, and that the delay "has had several consequences"—including that "[t]he total amount of unforced capacity sold in Zones G, H, and I has fallen by 1 GW (or 21 percent) since the summer of 2006." Joint Intervenors' App'x A-74. The report further suggested that "[s]ome of this capacity may have been economic to remain in service or been maintained more reliably if the . . . capacity zone had been implemented sooner." *Id.* This evidence of negative consequences resulting from the initial delay in the Lower Hudson Valley Zone's implementation supported FERC's prediction that further delay would cause similar results.

There was also evidence supporting FERC's prediction that further capacity resource losses in the Lower Hudson Valley Zone not only would occur, but also

46

would jeopardize short-term reliability.[8]  An expert affidavit that FERC cited in the

Demand Curve Order stated that "the loss of any of . . . three large generating

facilities in Zones G-I would likely cause immediate and significant reliability

problems for the NYISO."  J.A. 790; *see* Demand Curve Order at P 159.  Moreover,

in both of its orders on rehearing, FERC pointed to NYISO's Summer 2014 Capacity

Assessment, which indicated that under extreme weather conditions, Southeast New

York would experience a capacity reserve shortage, and that NYISO might therefore

be required to invoke its emergency operating procedures to ensure sufficient

generation to meet Southeast New York's needs.  Zone Rehearing Order at P 17 n.29;

Demand Curve Rehearing Order at P 62 n.49.  New York Petitioners claim that FERC

miscalculated the size of the potential shortage, but as Joint Intervenors point out,

a shortage of any magnitude would reasonably have provided cause for concern.

FERC is owed deference in drawing conclusions from this report.  And although

FERC's ordinary practice is not to consider new evidence on rehearing, *see Exxon*

---

[8] NYISO's own expert's statement that discounted capacity prices "would be adequate to retain sufficient existing capacity to meet reliability needs," J.A. 1625, does not require us to reject FERC's contrary conclusion.  *See Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 746-47 (D.C. Cir. 2001) (describing "the presence of disputing expert witnesses" as "a classic example of a factual dispute the resolution of which implicates substantial agency expertise" (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376 (1989)) (internal quotation marks omitted)).

*Corp. v. FERC*, 114 F.3d 1252, 1260 n.12 (D.C. Cir. 1997), Petitioners point to no authority suggesting that FERC is *prohibited* from doing so when the evidence is in the record already or, as with NYISO's Summer 2014 Capacity Assessment, is publicly available. *See, e.g., Wis. Power & Light Co. v. FERC*, 363 F.3d 453, 463 (D.C. Cir. 2004) (approving consideration of "relevant, publicly available studies, which need not have been introduced into the record").

Furthermore, there was evidence in the record suggesting that specific resources would respond to the incentives created by immediate implementation of the Lower Hudson Valley Zone's demand curve. In the Demand Curve Order, FERC cited a submission from Entergy, which suggested that "a phase-in that would suppress prices for a two-year period would discourage competitive supply." Demand Curve Order at P 164. The cited portion of Entergy's submission discussed a specific generating facility called Bowline Unit 2, which NRG was considering restoring in response to the creation of the Lower Hudson Valley Zone. J.A. 1721-23. NRG had indicated that it was far more likely to pursue this restoration if there were no phase-in of the demand curve for the new zone.[9] (Contrary to Utility Petitioners'

---

[9] The brief filed by NRG as an Intervenor in this appeal supports Entergy's argument before FERC that the restoration of Bowline Unit 2 was financially justified only upon creation of the new zone.

argument, this evidence was not newly introduced at the rehearing stage.) Although Utility Petitioners challenge NRG's suggestion that the phase-in of the demand curve would actually affect its investment decisions given that Bowline Unit 2 would not be restored in time for, or eligible to participate in, 2014 capacity auctions, we think FERC rationally could have credited NRG's and Entergy's arguments, which were supported by an affidavit from Entergy's expert, that a phase-in would increase perceived regulatory risk and therefore reduce the likelihood of Bowline Unit 2's being restored in the short term—regardless of when the facility would actually be able to participate in capacity auctions. *See* J.A. 1721-23.

Finally, New York Petitioners also suggest that FERC's concern about reliability cannot be squared with its rejection of a reliability criterion in the New Zone Criteria Orders, rendering its reasoning arbitrary and capricious. This argument is a red herring. As we have discussed, FERC made clear throughout both of the proceedings at issue that the "highway" deliverability criterion that it instructed NYISO to apply in determining the need for a new zone was designed to address reliability concerns caused by transmission constraints. Accordingly, FERC's reliance on reliability concerns in rejecting a phase-in was wholly

49

appropriate.

Given the deference that FERC is owed in this highly technical area, we conclude that its economic predictions about the effects of immediately implementing the Lower Hudson Valley Zone and its demand curve, combined with the evidence described above suggesting that a phase-in of the demand curve would inhibit efforts to incentivize needed short-term supply responses, were sufficient to support its decision to reject the phase-in of the new zone and its demand curve. Because FERC adequately justified higher prices by reference to specific offsetting short-term benefits, there is no basis for us to disturb FERC's conclusion that the higher rates generated by the immediate implementation of the new zone were just and reasonable.

### 3. State Transmission Upgrades

We also reject New York Petitioners' argument that it was arbitrary and capricious for FERC to decide to proceed with establishing the Lower Hudson Valley Zone despite the NYPSC's claims that New York's planned transmission upgrades would eliminate the transmission constraint on which the new zone was premised.

FERC rationally considered and rejected evidence introduced by the NYPSC regarding New York's planned transmission upgrades. In its Zone Rehearing Order, FERC stated that it was "fully cognizant that the NYPSC has two proceedings underway that may result in the construction of major transmission facilities during the 2016-2018 timeframe [which] could alleviate the long-standing transmission constraint." Zone Rehearing Order at P 18 (footnote omitted). But it explained that, "to date, no major new transmission facility has completed the certification review process required under Article VII of the New York State Public Service Law"—which "sets forth the existing certification review process for citing major utility transmission facilities in New York State"—and "there is no assurance that any facilities would be completed during the 2016-2018 time frame." *Id.* at P 18 & n.33. Similarly, in the Demand Curve Rehearing Order, FERC explained that "there is no assurance that any facilities would be completed during the 2016-2018 time frame." Demand Curve Rehearing Order at P 63. And in the Zone Order, FERC emphasized that "the transmission upgrades that the NYPSC expects to result from its proceedings have not yet been built." Zone Order at P 23.

As discussed above, FERC approved the Lower Hudson Valley Zone in order to ensure that the capacity market more accurately reflected true market conditions.

51

Because FERC explained that potential future transmission upgrades that might alter those conditions were speculative, it rationally explained its decision to act according to existing market conditions rather than speculative future conditions.

### 4. Zone Elimination

Petitioners also claim that FERC should have required NYISO to establish a process for the elimination of the new Lower Hudson Valley Zone when it established that zone. As discussed, FERC now concedes that price separation between the Lower Hudson Valley Zone and the remaining portions of the New York Control Area may continue even if the transmission constraint justifying the creation of the Lower Hudson Valley Zone is eliminated. *See* Zone Order at P 83. But assuming arguendo that Petitioners are correct that such price separation would lead to unjust and unreasonable rates, FERC was not required to address that potential future concern in the orders under review.

In its Zone Rehearing Order, FERC explained that "any new rules for discontinuing a capacity zone must apply to all capacity zones and not just the recently-approved new [Lower Hudson Valley Zone] and, therefore, should be the subject of a separate proceeding that develops a record for establishing tariff criteria and procedures for eliminating any capacity zone, including any future new

capacity zone and not just the new [Lower Hudson Valley Zone] at issue here."
Zone Rehearing Order at P 45.

FERC "enjoys broad discretion in determining how best to handle related, yet
discrete, issues in terms of procedures." *Mobil Oil Exploration & Producing Se., Inc.
v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) (citation omitted); *see also Heckler v.
Chaney*, 470 U.S. 821, 831-32 (1985). The D.C. Circuit has logically applied this
reasoning to the context of market rules adopted by FERC, holding that FERC may
appropriately address one market problem even if it potentially exacerbates another.
*See TC Ravenswood, LLC v. FERC*, 705 F.3d 474, 478-79 (D.C. Cir. 2013) (holding that
FERC could adopt rules regarding supply-side market power without
simultaneously addressing buy-side market power). We agree with this reasoning.
FERC can address the current problem it has diagnosed—i.e., that rates do not
reflect true market conditions because a transmission constraint prevents capacity
from reaching the Lower Hudson Valley Zone—without simultaneously addressing
problems that may result from changed market conditions. FERC's argument that
a mechanism for eliminating unneeded zones should be consistent across zones, and
that such a rule should not be dealt with in this proceeding because it implicates
other parties, is reasonable. *See* Zone Rehearing Order at P 45. Further, FERC has

instructed NYISO to work with stakeholders to address the issue of zone elimination. *Id.*

Although the D.C. Circuit has held that FERC abuses its discretion in addressing related yet discrete issues where "its manner of proceeding significantly prejudices a party or unreasonably delays a resolution," *La. Pub. Serv. Comm'n v. FERC*, 482 F.3d 510, 521 (D.C. Cir. 2007), FERC has not significantly prejudiced Petitioners in this case. New York Petitioners concede that even if New York's planned transmission upgrades are completed as scheduled, they will not all be complete until 2018, leaving FERC time to address the potential issue created by elimination of the transmission constraint in another proceeding. However, significant prejudice does not occur where the harm caused to a party is speculative. *See id.* In the event that the transmission constraint on which the Lower Hudson Valley Zone is based is eliminated and FERC has not yet established a process for zone elimination, Petitioners are free to file a complaint under Section 206 of the Federal Power Act, 16 U.S.C. § 824e, challenging NYISO's tariff as unjust and unreasonable.

### 5. Cost Causation

The final issue we must address is Utility Petitioners' argument that the Lower Hudson Valley Zone unfairly apportions charges arising from the transmission constraint on which NYISO premised the creation of the new zone. Rates approved by FERC must "reflect to some degree the costs actually caused by the customer who must pay them." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 237 (D.C. Cir. 2013) (quoting *E. Ky. Power Coop., Inc. v. FERC*, 489 F.3d 1299, 1303 (D.C. Cir. 2007) (internal quotation mark omitted)). Utility Petitioners contend that the Lower Hudson Valley Zone unfairly apportions capacity charges because NYISO's calculation of the LCR for the new zone is flawed, causing some customers in the Lower Hudson Valley Zone to pay more than their share of capacity charges. Utility Petitioners made this argument to FERC in a protest in FERC's Zone proceeding, and raised it again in their request for rehearing of the Zone Order.

However, FERC explained in the Zone Order that NYISO's calculation of the Lower Hudson Valley Zone's LCR was outside the scope of the Zone proceeding because the new zone's LCR "is not used to determine whether a new capacity zone should be created or to establish the new capacity zone boundary; it is used solely for establishing an [installed capacity] Demand Curve for the new capacity zone."

55

Zone Order at P 66; *see also* Zone Rehearing Order at P 27. FERC explained that the Zone proceeding, as opposed to the parallel Demand Curve proceeding, was "narrowly focused on determining whether NYISO followed its tariff in determining that a new capacity zone should be created." Zone Order at P 66; *see also* Zone Rehearing Order at P 27.

It is true that NYISO discussed the LCR for the Lower Hudson Valley Zone in its tariff filing in the Zone proceeding, providing an affidavit in which its experts explained how the LCR for the Lower Hudson Valley Zone was calculated and specifying that under their planned method of calculation, the resulting LCR for the new zone would be 88 percent. J.A. 561-62. But NYISO also specifically noted that its filing would only briefly address the LCR determination for the Lower Hudson Valley Zone because—as FERC explained in addressing Utility Petitioners' protest—LCRs "are used solely for establishing revised [installed capacity] Demand Curves." J.A. 127 (internal quotation mark omitted). NYISO's filing thus stated that "[t]he actual [LCR] that will be used to administer market rules for the [Lower Hudson Valley Zone] will be established in the same manner as, and concurrent with, the LCRs for existing" capacity zones, and that the Lower Hudson Valley Zone's LCR would therefore be an element of NYISO's filing in the Demand Curve

proceeding.  J.A. 127 & n.17; *see* Zone Order at P 64 & n.67.

Given FERC's broad discretion to address related issues in discrete proceedings, *see TC Ravenswood*, 705 F.3d at 478-79, it was permissible for FERC to determine that the method by which the LCR was calculated was outside the scope of the Zone proceeding because it would be addressed in the Demand Curve proceeding.  Utility Petitioners argue that FERC was required to review the LCR in the Zone proceeding because it had the burden of showing that the creation of the new zone would result in just and reasonable rates.  While it was clear, however, that the Zone proceeding's authorization of the Lower Hudson Valley Zone would result in new rates for that zone, FERC explained that in the Zone proceeding, it only had to show that the *creation* of the new zone—and not the LCR for the zone—was just and reasonable; the specific LCR that would actually affect the apportionment of rates among different zones' customers would be used only to construct the demand curve, and not to set up the zone itself.  *See* Zone Order at P 66; Zone Rehearing Order at P 27.  Whether the demand curve for the Lower Hudson Valley Zone was just and reasonable (and whether the rates imposed on the new zone complied with cost-causation principles) would be addressed in the Demand Curve proceeding.

57

As we have noted, FERC was not free to "slice and dice issues to the prejudice of a party." *TC Ravenswood*, 705 F.3d at 478; *see La. Pub. Serv. Comm'n*, 482 F.3d at 521. But we are not persuaded by Utility Petitioners' arguments that FERC abused its discretion here. Utility Petitioners claim that FERC's failure to address the LCR in its Zone proceeding was contrary to the New Zone Criteria Compliance Order's guarantee that the LCR for the new zone would be reviewable. But while the New Zone Criteria Compliance Order did state that NYISO's tariff provides for review and comment of an LCR for a new zone, it did not imply that this review and comment could not take place in a proceeding separate from the one in which the creation of the new zone was evaluated. *See* New Zone Criteria Compliance Order at P 50. Thus, FERC did not contradict this order by specifying that the LCR would be reviewed in the Demand Curve proceeding rather than the Zone proceeding. Nor were Utility Petitioners prejudiced: FERC stated on August 13, 2013 (in the Zone Order) that it would address the new zone's LCR in the Demand Curve proceeding, and NYISO did not file its proposal in the Demand Curve proceeding until November 29, 2013.

Utility Petitioners also suggest that the Demand Curve proceeding was not the appropriate venue for challenging NYISO's LCR calculation because NYISO

58

failed to submit any evidence in that proceeding explaining how the LCR was calculated.  NYISO, however, specifically stated in its Zone proceeding filing that the LCR for the Lower Hudson Valley Zone would be part of its Demand Curve proceeding filing, and indeed, its latter filing included proposed LCRs for each capacity zone calculated as set forth in its tariff.  FERC also acknowledged in its Demand Curve Order that NYISO had "propose[d] an additional locational [installed capacity] requirement"—in other words, an LCR—"for the new capacity zone."  Demand Curve Order at P 3.  The LCR for the new zone was therefore plainly at issue in the Demand Curve proceeding.  Utility Petitioners, however, failed to challenge NYISO's calculation or methodology in the Demand Curve proceeding, either prior to FERC's first Demand Curve Order or in their request for rehearing.

And while FERC now claims—seemingly at odds with its contention that Utility Petitioners' cost-causation argument would have received a hearing in the Demand Curve proceeding—that its review of NYISO's LCR calculation was limited to determining whether NYISO properly followed its pre-existing methodology because that methodology was prescribed in NYISO's tariff,[10] the question whether

---

[10] FERC claims that the only way for Utility Petitioners to raise their cost-causation argument would be in a proceeding challenging NYISO's tariff under § 206 of the FPA,

59

Utility Petitioners would have persuaded FERC to consider its arguments is irrelevant to whether those arguments were properly raised in the Zone proceeding. Had Utility Petitioners raised their arguments in the Demand Curve proceeding, and had FERC in fact refused to hear them, Utility Petitioners might well be on stronger ground in claiming prejudice from FERC's "slic[ing] and dic[ing]." *TC Ravenswood*, 705 F.3d at 478. But because NYISO and FERC both made it clear well before the Demand Curve proceeding was initiated that challenges to the LCR calculation should be brought in that proceeding, Utility Petitioners' failure to present any such challenges to FERC in the first instance bars them from raising those challenges before this Court. *See* 16 U.S.C. § 825*l*(b).

## CONCLUSION

For the foregoing reasons, we conclude that FERC adequately justified its decision to authorize NYISO to create the Lower Hudson Valley Zone as well as its decision not to phase in the new zone and its demand curve, notwithstanding New York's transmission upgrade initiatives. FERC was not obligated, in the orders

16 U.S.C. § 824e. *See, e.g., FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 348-49 (D.C. Cir. 2014) ("Section 206 empowers FERC to make a determination on existing rates and to modify them if they are found to be 'unjust, unreasonable, unduly discriminatory or preferential.' An investigation under section 206 may arise upon complaint or on FERC's own initiative." (citation omitted) (quoting 16 U.S.C. § 824e(a))).

under review, to require NYISO to implement a process for eliminating the new zone. And Utility Petitioners raised their cost-causation argument in the wrong proceeding. Accordingly, the petitions for review are **DENIED**.